STATE of Wisconsin, Plaintiff-Respondent,

v.

Agustin LOPEZ, Defendant-Appellant. †

Court of Appeals

*No. 95–3250–CR. Submitted on briefs October 31, 1996.—Decided December 11, 1996.*

(Also reported in 559 N.W.2d 264.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Gill M. Semancik* of *Law Office of Brendan J. Rowen* of Wauwatosa.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general and *Thomas J. Balistreri*, assistant attorney general.

Before Anderson, P.J., Nettesheim and Snyder, JJ.

ANDERSON, P.J. Agustin Lopez appeals from a judgment of conviction and an order denying his postconviction motion. He contends that the search warrant of his home was not supported by probable cause, and thus, the evidence seized was found as part of an illegal search and was inadmissible. Lopez further argues that § 161.49, STATS.,[1] the penalty enhancer, is void for vagueness. In the alternative, he maintains that the State violated his due process rights by seeking the enhancer because the park in question is a passive park, but is not a place where children congregate. We reject his arguments and affirm.

BACKGROUND

On June 9, 1994, the circuit court for Waukesha county issued a search warrant for N163 W19325 Cedar Run Drive, village of Jackson, which is approximately 480 feet from Cedar Run Park, a public park operated by the village. Detective David Janisch of the Waukesha County Metropolitan Drug Enforcement Group swore under oath to the facts as set forth in the affidavit which supported the search warrant. The affidavit stated that an informant, who had proven reliable in the past,[2] indicated that he had contact with Roger Lopez, who sold marijuana that he

---

[1] Chapter 161, STATS., has been redesignated to ch. 961, STATS. See 1995 Wis. Act 448 § 106 et seq.

[2] In the past, this informant made a one-quarter pound controlled buy of marijuana; he provided information leading to search warrants, which resulted in approximately fifteen pounds of marijuana being seized and the seizure of two pounds of marijuana and one ounce of cocaine.

obtained from his brother "Gus."[3] According to the informant, Roger told him that "Gus" obtained thirty-five to forty pounds of marijuana from a source in Chicago, but he was having trouble getting rid of it. In fact, Roger indicated that "Gus" had most of the marijuana left, and he stored it at his house in the Mequon area. Roger also told the informant that "Gus" was about forty years old and was married.

Initially, Janisch corroborated the information regarding Roger and then conducted surveillance at Roger's residence in the village of Cudahy. During the surveillance, Janisch contacted the informant to have him order one pound of marijuana from Roger. When the informant placed his order, Roger told him that he would call him back in a few minutes. Shortly thereafter, Roger returned the call and said "Gus" was bringing the one pound of marijuana over to Roger's house and would be there within "half an hour."

Approximately twenty minutes later, Janisch observed a black 1989 Pontiac Grand Am arrive at Roger's residence. Janisch also noted that the individual who arrived in the Grand Am was a Hispanic male, approximately forty years old, six feet tall, slim and carrying a duffle bag. Janisch then confirmed through the Wisconsin Department of Transportation (DOT) records that the Grand Am was listed to "Gus" and Janice Lopez of N163 W19325 Cedar Run Drive and the individual driving the Grand Am matched the physical description and approximate age of Lopez's driver's license record. Janisch also

---

[3] The police later confirmed that "Gus" and Agustin Lopez were one and the same. We will, throughout the opinion, refer to Agustin or "Gus" Lopez as Lopez. All other references to "Gus" are taken from the record. Roger Lopez will be referred to as Roger.

verified through Wisconsin Electric Utilities that Lopez is the resident of N163 W19325 Cedar Run Drive and has been since August 1989.

Shortly after the individual with the duffle bag arrived at Roger's residence, Roger phoned the informant to let him know that the one pound of marijuana had just arrived. The informant set up a meeting to complete the one-pound transaction of marijuana for $1200. Janisch next observed a different Hispanic male leave Roger's residence in the Grand Am registered to "Gus" Lopez.

Janisch also conducted surveillance at the meeting place. There he observed the Grand Am arrive and the driver exit the vehicle, open the trunk, take out a Pepsi twelve-pack carton and walk to the informant's vehicle. The informant drove around the block with the driver. The informant wore a wire transmitter during the transaction and Janisch heard the individual identified as Roger state that a ten-pound deal would be "no problem," and that "Gus" had a lot left at "Gus's" house and the price would be approximately $1200 per pound. The driver also indicated that "Gus's" source in Chicago was still waiting for the money from the marijuana and that he had to give money to "Gus" for the pound. The informant returned and dropped off the driver of the Grand Am. The surveillance team followed the Grand Am back to Roger's residence and Janisch met with the informant. The informant turned over a Pepsi carton containing approximately one pound of marijuana.

Janisch returned to Roger's residence and noted that the Grand Am remained there for approximately three more hours. The driver who initially arrived in Lopez's vehicle exited Roger's residence and drove away in the Grand Am. The surveillance team followed

the vehicle to Washington county where it was ordered to back off to avoid detection. Janisch simultaneously set up surveillance at Lopez's residence in the village of Jackson and within a short time observed Lopez's vehicle arrive and park in the rear parking lot. The individual who exited the car was the same individual observed leaving Roger's residence.

According to the criminal complaint, during execution of the search warrant at the Lopez residence, the officers discovered thirty-five separately wrapped bags of greenish-brown material believed to be marijuana in the basement area in a freezer. The material tested positive for tetrahydrocannabinol, the active ingredient in marijuana. The total weight of the bags was approximately 48.5 pounds or 22,019 grams. The search also uncovered approximately $8500 in cash, an OHaus triple-beam scale and various drug paraphernalia.

Lopez filed a motion to dismiss, a motion to suppress physical evidence and a motion to suppress statements. The trial court denied all of the motions, except the motion to suppress statements as it related to evidence concerning a key to the freezer in the basement. However, the trial court denied the motion to suppress the evidence based upon the statement. Lopez subsequently pled no contest to criminal charges. A judgment of conviction was entered against him for possession of marijuana with intent to deliver within 1000 feet of a park. Lopez filed a motion for postconviction relief, which was denied. Lopez appeals.

SEARCH WARRANT AND EVIDENCE

█

Lopez first argues that the search warrant was not based on probable cause and therefore the evidence

seized from the freezer was the product of an illegal search. In deciding whether probable cause to issue a search warrant existed, we defer to the trial court's determination. Great deference should be given to the warrant-issuing court's determination of probable cause. The deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant. *See State v. Falbo*, 190 Wis. 2d 328, 334, 526 N.W.2d 814, 816 (Ct. App. 1994).

Lopez argues that there is no evidence in the affidavit to establish the veracity of the information provided by Roger to the confidential informant. "The only corroboration done by Detective Janisch was to stake out Roger's residence and arrange a purchase through the confidential informant." Thus, Lopez maintains that the only probable cause the affidavit supported was for a search of Roger's residence, but not his.

The existence of probable cause is determined by applying the totality of the circumstances test adopted in *Illinois v. Gates*, 462 U.S. 213 (1983). *State v. Anderson*, 138 Wis. 2d 451, 468, 406 N.W.2d 398, 406 (1987). When issuing a search warrant, the issuing court must simply make a commonsense determination as to whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See Falbo*, 190 Wis. 2d at 337, 526 N.W.2d at 817. In making this decision, the trial court must consider all of the circumstances set forth in the affidavit, including the veracity and basis of knowledge of persons supplying hearsay information. *See id.* However, elaborate specificity is not required, and the officers are entitled to the support of the usual

inferences which reasonable people draw from facts. *State v. Marten*, 165 Wis. 2d 70, 75, 477 N.W.2d 304, 306 (Ct. App. 1991).

Under the totality of the circumstances of this case, we conclude that the search warrant affidavit provided a substantial basis for concluding that there was a "fair probability" that marijuana would be found on Lopez's premises. *See Gates*, 462 U.S. at 238. The informant provided details regarding Roger and a potential drug transaction with Roger, which were either verified or observed by Janisch. In addition, the informant relayed information about "Gus" that he received from Roger and Janisch verified much of this information as well.

When an informant is shown to be right about some things he or she has alleged, it is probable that the informant is also right about others. *State v. Richardson*, 156 Wis. 2d 128, 141, 456 N.W.2d 830, 835 (1990). Independent police corroboration of the informant's information imparts a degree of reliability to unverified details. *Id.* at 142-43, 456 N.W.2d at 836. Many of the details the informant received from Roger were verified. After getting preliminary information about Lopez, which was all verified, a controlled buy was set up with a police officer surveillant. The events as they unfolded matched the facts as stated by the informant. Because the informant in this case was shown to be correct about other aspects of the Lopez drug-trafficking operation, including information funneled through Roger, we may infer that he was also correct about the unverified fact that Lopez had significant amounts of unsold marijuana at his home. These observations, given a commonsense reading, are

adequate to support the trial court's issuance of the warrant.

Nevertheless, Lopez contends that the marijuana found in the freezer in the basement of his residence was found because of an illegal statement he gave to the police. He insists that the police would not have discovered the marijuana in the freezer but for the illegal search warrant and the illegal questioning of Lopez; and therefore the evidence should be suppressed. We are unpersuaded.

At the suppression hearing, police officer John R. Gibbs testified that during the execution of the search warrant, he located a freezer in the basement that was locked. In order to avoid prying it open, he asked Lopez where the key was located. Although Lopez was in custody, the police had not yet read him his *Miranda* warnings; nevertheless, Lopez told him where it was hidden. Gibbs found a large quantity of marijuana in the freezer. The trial court determined that since there were no *Miranda* warnings given, the statement itself should be suppressed. However, the trial court refused to suppress the evidence because it found that "if nothing had been said the officer would have gone down and either found the key or . . . taken the nearest pry bar and sprung the door"; the evidence would have inevitably been found.

Lopez contests the application of the doctrine of inevitable discovery. Under this doctrine, evidence obtained during a search which is tainted by some illegal act may be admissible if the tainted evidence would have been inevitably discovered by lawful means. *State v. Schwegler*, 170 Wis. 2d 487, 499, 490 N.W.2d 292, 297 (Ct. App. 1992). The State must establish: (1) a reasonable probability that the

evidence in question would have been discovered by lawful means but for the police misconduct, (2) that the leads making the discovery inevitable were possessed by the government at the time of the misconduct, and (3) that prior to the unlawful search the government also was actively pursuing some alternate line of investigation. *Id.* at 500, 490 N.W.2d at 297. We conclude that the State met its burden.

Even without Lopez's statement regarding the key, the freezer would have been searched and the evidence therein seized. Prior to going upstairs to ask Lopez about the key, Gibbs had already located and decided to search the freezer as part of the search of the residence. In addition, Gibbs was actively pursuing his decision to search the freezer when he asked Lopez about the key. If he had not found the key, Gibbs testified that he would have pried the freezer open. Inevitably the contents, if any, of the freezer would have been discovered. Accordingly, we conclude that the trial court correctly denied Lopez's motion to suppress based on the doctrine of inevitable discovery.

CONSTITUTIONALITY OF § 161.49, STATS.

Next, we address Lopez's constitutional challenges to § 161.49, STATS. The statute, he asserts, is void for vagueness or, in the alternative, was unconstitutionally applied to him because "the area considered to be a park was not of the type of area which the legislature intended to protect." Both arguments are without merit.

The constitutionality of a statute is a question of law which this court reviews without deference to the trial court. *State v. Hermann,* 164 Wis. 2d 269, 281, 474

N.W.2d 906, 910 (Ct. App. 1991). Legislative enactments are presumed constitutional and the court will sustain a statute against attack if there is any reasonable basis for the exercise of legislative power. *Id.* at 281, 474 N.W.2d at 911. Every presumption must be indulged to sustain the law if at all possible, and wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality. *Id.* The court cannot reweigh the facts found by the legislature. *Id.* If the court can conceive of any facts on which the legislation could reasonably be based, it must hold the legislation constitutional. *Id.*

### *Due Process*

Lopez argues that charging him under § 161.49, STATS., violates his right to due process because Cedar Run Park is not an area which the legislature intended to protect. He maintains that this park "was not intended to be an area where children congregate, there is no reasonable relationship between the sale or distribution of a controlled substance within 1,000 feet of the park' in question." We reach the opposite conclusion.

Due process requires that the means chosen by the legislature bear a reasonable and rational relationship to the purpose or objective of the enactment. *Hermann,* 164 Wis. 2d at 284, 474 N.W.2d at 912. Similarly, a statutory presumption cannot be sustained if there is no rational connection between the fact proved and the ultimate fact presumed. *Id.*

Chapter 161, STATS., known as the Uniform Controlled Substance Act, was enacted in response to the serious problem of substance abuse in society.

Section 161.001, STATS. As a partial solution, the laws regulating controlled substances were enacted with penalties. *Id.* Persons who illicitly traffic in controlled substances are potentially subject to lengthy sentences to deter further trafficking, to protect the public from their "pernicious" activities and to restore them to legitimate and socially useful endeavors. Section 161.001(1).

Section 161.49, STATS., specifically addresses the distribution of or possession with intent to deliver a controlled substance on or near certain places. When an individual engages in the "dangerous activity" of delivering or possessing drugs, he or she can be held strictly liable for carrying on that activity in a statutorily protected area. *See Hermann*, 164 Wis. 2d at 280-81, 474 N.W.2d at 910. As this court noted in *Hermann*, § 161.49 serves "to enforce a high standard of care for the *protection of the public*, and of schoolchildren in particular." *Hermann*, 164 Wis. 2d at 281, 474 N.W.2d at 910 (emphasis added). We also stated:

> Regardless of whether children actually are present or directly involved in the transactions, [t]he consequences of such transactions inevitably flow from inside the dwellings onto the streets and contribute directly to the violent and dangerous criminal milieu Congress sought to eliminate in the proximity of [certain places]. Regulations such as § 161.49 aid in dissipating the violent and criminal milieu near [statutorily protected places].

*Id.* (quoted source omitted) (citations omitted).

■ As in *Hermann,* the means chosen here—enhanced penalties for those convicted of drug transactions near any park—bear a reasonable and rational relationship to the deterrence of such activities. *See id.* at 284-85, 474 N.W.2d at 912. Whether children are directly involved is irrelevant; ch. 161, STATS., seeks to protect the public from trafficking, not just children. *See* § 161.001(1) and (2), STATS.; *Hermann,* 164 Wis. 2d at 285, 474 N.W.2d at 912. Thus, the fact proved (the proximity to a village park) is rationally related to the ultimate fact presumed (protection of the public's health and safety from "pernicious" drug trafficking activities). *See* § 161.001(1) and (2); *Hermann,* 164 Wis. 2d at 285, 474 N.W.2d at 912.

Lopez also argues that Cedar Run Park, which is designated as a passive park, does not fulfill the intent of the statute. He maintains that there are no indications, such as park benches or play apparatus, that the area is used as a park in the common sense of the word. Since this passive park "is not intended to be used by children," he theorizes that the penalty enhancer is unconstitutional as applied to him. Again, we are unpersuaded.

■ This argument concerns the construction of § 161.49, STATS., a question of statutory construction, which we review as a question of law independently of the trial court. *Drangstviet v. Auto-Owners Ins. Co.,* 195 Wis. 2d 592, 598, 536 N.W.2d 189, 190 (Ct. App. 1995). We have previously determined that 161.49 is unambiguous. *See State v. Rasmussen,* 195 Wis. 2d 109, 114, 536 N.W.2d 106, 108 (Ct. App. 1995). When a statute is unambiguous, it must be interpreted on the

basis of the plain meaning of its terms. *See State v. Williquette*, 129 Wis. 2d 239, 248, 385 N.W.2d 145, 149 (1986). Nontechnical words utilized in the statute must be given their ordinary and accepted meaning when not specifically defined and that meaning may be ascertained from a recognized dictionary. *Id.*

Since "park" is not defined within §§ 161.01 or 161.49, STATS., we look to the standard dictionary definitions for guidance. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1642 (1976) defines a park as: "a tract of land maintained by a city or town as a place of beauty or public recreation." Our supreme court has defined a park as: "[a] piece of ground set apart and maintained for public use, and laid out in such a way as to afford pleasure to the eye as well as opportunity for open-air recreation." *State ex rel. Hammann v. Levitan*, 200 Wis. 271, 279, 228 N.W. 140, 143 (1929) (quoted source omitted). We conclude that the ordinary and accepted meaning of "park" encompasses a passive or undeveloped park such as this one.

Moreover, this construction is consistent with the legislative purpose to protect the public from the dangerous conditions associated with drug trafficking. As we noted in *State v. Andrews*, 171 Wis. 2d 217, 491 N.W.2d 504 (Ct. App. 1992), ch. 161, STATS., was modeled after a federal statute, 21 U.S.C. § 860. *Andrews*, 171 Wis. 2d at 224, 491 N.W.2d at 506. We also pointed out that § 161.49, STATS., and 21 U.S.C. § 860 are substantially similar in that both provide for a stiffer penalty if the drug sale takes place within 1000 feet of various specified places, in particular where children and young people tend to congregate. *Andrews*, 171 Wis. 2d at 224, 491 N.W.2d at 506.

However, the statutes are not identical: 21 U.S.C. § 860, the "schoolhouse" provision of federal drug law, proscribes the sale of drugs in or on, or within 1000 feet of schools, colleges and playgrounds. "Playground" is specifically defined as "any outdoor facility (including any parking lot appurtenant thereto) intended for recreation, open to public, and with any portion thereof containing three or more separate apparatus intended for the recreation of children." 21 U.S.C. § 860(e). In contrast, § 161.49, enhances the penalty for drug sales "within 1000 feet of a state, county, city, village or town park."[4] We presume the difference in the language of the federal and state statutes reflects a deliberate choice because we presume our legislature enacted § 161.49 with full knowledge of existing law. *See Andrews*, 171 Wis. 2d at 224, 491 N.W.2d at 506.

Although Lopez concedes that jail and correctional facilities, also included in the definition, are not places where children tend to congregate, he nevertheless insists that the intent of the penalty enhancer is limited to "places where children tend to congregate." We disagree.

---

[4] Section 161.49, STATS., provides in relevant part:

(1) If any person . . . violates s. 161.41(1m)(cm), (d), (e), (f), (g) or (h) by possessing with intent to deliver, a controlled substance included under s. 161.14(7)(L) or 161.16(2)(b), . . . or any form of tetrahydrocannabinols while in or on the premises of a scattered-site public housing project, while in or otherwise within 1,000 feet of a state, county, city, village or town park, a jail or correctional facility, a multiunit public housing project, a swimming pool open to members of the public, a youth center or a community center, while on or otherwise within 1,000 feet of any private or public school premises or while on or otherwise within 1,000 feet of a school bus, as defined in s. 340.01(56), the maximum term of imprisonment prescribed by law for that crime may be increased by 5 years.

The legislature deliberately included "state, county, city, village or town park" within § 161.49, STATS., which by definition are tracts of land set aside for public use and recreation. Cedar Run Park is clearly within the ambit of statutorily protected areas. Unlike the federal statute which clearly limits 21 U.S.C. § 860 to playgrounds with a minimum of three separate apparatus intended for the recreation of children, § 161.49 applies to all Wisconsin parks. We are satisfied that the legislature intended a broader application of § 161.49 than its federal equivalent. This includes areas where the public's health and safety may be jeopardized, instead of *only* those areas where children may congregate or recreate.

We conclude that the proximity to a public park, including an undeveloped park, is rationally related to protect the public's health and safety from drug-trafficking activities. Because Lopez possessed over forty-five pounds of marijuana within 1000 feet of Cedar Run Park, his right to due process was not violated by the State charging him under the penalty enhancer.

## *Void for Vagueness*

Lopez's alternative argument is that § 161.49, STATS., is void for vagueness. Specifically, he argues that "the park zone enhancer . . . does not provide adequate notice to allow a person who wanted to satisfy the statute with a standard of what would qualify as a 'park.' " We reject this argument as well.

The void for vagueness doctrine rests upon the constitutional principle that procedural due process

requires fair notice and proper standards for adjudication. *State v. Hall*, 196 Wis. 2d 850, 872, 540 N.W.2d 219, 229 (Ct. App. 1995), *rev'd on other grounds*, 207 Wis. 2d 54, 557 N.W.2d 778 (1997). Before a criminal statute may be invalidated for vagueness, we must be convinced beyond a reasonable doubt that there is some uncertainty or ambiguity in the description of the conduct prohibited that prevents a person of ordinary intelligence who wants to obey the statute from determining what is prohibited conduct. *Id.*

This court has already determined that the enhancing statute, § 161.49, STATS., is unambiguous; there we stated:

> [The statute] expressly preconditions enhancement on a violation of § 161.41(1m), STATS. . . . The crime of possession with intent to deliver a controlled substance is complete, whenever and wherever it occurs. If the elements are satisfied, the crime is committed regardless of whether the intent is to deliver at a particular time or place. If § 161.41(1m) has been violated, and the violation occurred in one of the zones described in 161.49, then the latter statute increases the penalty.

*Rasmussen*, 195 Wis. 2d at 114, 536 N.W.2d at 108. As *Rasmussen* points out, there is no ambiguity in the description of the prohibited conduct.

As previously discussed, even though the term "park" is not defined in the statute, a person of ordinary intelligence is well apprised of its meaning. We therefore conclude that § 161.49, STATS., provides fair warning that the term "park" as contemplated by

435

the statute encompasses parks which may be designated by signs or contain park benches, as well as passive or undeveloped parks such as this one.

## CONCLUSION

In sum, we conclude that there was probable cause to search Lopez's home and therefore the evidence was admissible under the doctrine of inevitable discovery. In addition, the application of § 161.49, STATS., to Lopez did not violate his right to due process. We further conclude that § 161.49 is not unconstitutionally vague. Accordingly, we affirm the judgment of conviction and the order of the trial court.

*By the Court.*—Judgment and order affirmed.