# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP2238-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |          Plaintiff-Appellant, |
| |    v. |
| | Mastella L. Jackson, |
| |          Defendant-Respondent-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 363 Wis. 2d 554, 866 N.W.2d 768)
(Ct. App. 2015 – Published)
PDC No.: 215 WI App 49

| | |
|---|---|
| OPINION FILED: | July 1, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 25, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Outagamie |
|   JUDGE: | Mark J. McGinnis |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | ABRAHAMSON, J. and BRADLEY, A. W., J. dissent (Opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-respondent-petitioner there were briefs by *Andrew R. Hinkel*, assistant state public defender. Oral argument by *Andrew R. Hinkel*.

For the plaintiff-appellant the cause was briefed by *Jeffrey J. Kassel*, assistant attorney general, with whom on the brief was *Brad D. Schimel*, attorney general. Oral argument by *Luke N. Berg*, deputy solicitor general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP2238-CR
(L.C. No. 2012CF147)

STATE OF WISCONSIN : IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Appellant,**

  **v.**

**Mastella L. Jackson,**

      **Defendant-Respondent-Petitioner.**

**FILED**

**JUL 1, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals reversing an order by the Outagamie County Circuit Court suppressing physical evidence as "fruit of the poisonous tree."[1]

¶2 The case arises out of a 2012 stabbing death at a hotel in the Town of Grand Chute, west of Appleton. Police suspected that Mastella Jackson (Jackson), the victim's wife,

---

[1] State v. Jackson, 2015 WI App 49, 363 Wis. 2d 554, 866 N.W.2d 768.

might have been involved in the death, so they brought her to the Grand Chute Police Department and interrogated her for more than six hours without giving her a <u>Miranda</u> warning. Jackson made incriminating statements during the interrogation. At the end of the interrogation, Jackson agreed to go with detectives to her residence, where officers were already conducting a search pursuant to a search warrant. There, she revealed the location of the knife used in the stabbing and the bloody clothing she was wearing when she left the hotel.

¶3 After the State charged Jackson with first-degree intentional homicide, she moved to suppress all evidence obtained in violation of her constitutional rights. The circuit court excluded not only Jackson's statements but also the physical evidence obtained from her house, which the circuit court deemed fruit of the poisonous tree. The court of appeals reversed as to the physical evidence, concluding that the State had demonstrated that the officers searching the house would inevitably have discovered the knife and clothing during their search.

¶4 In <u>Nix v. Williams</u>, 467 U.S. 431 (1984), the Supreme Court of the United States approved an inevitable discovery exception to the exclusionary rule. This court has not applied the inevitable discovery exception since <u>State v. Weber</u>, 163 Wis. 2d 116, 471 N.W.2d 187 (1991). Since <u>Weber</u>, however, the court of appeals has decided a series of inevitable discovery cases. <u>See</u> <u>State v. Avery</u>, 2011 WI App 124, 337 Wis. 2d 351, 804 N.W.2d 216; <u>State v. Lopez</u>, 207 Wis. 2d 413, 559 N.W.2d 264

2

(Ct. App. 1996); <u>State v. Schwegler</u>, 170 Wis. 2d 487, 490 N.W.2d 292 (Ct. App. 1992).

¶5 Jackson now urges us to reassess the inevitable discovery doctrine. She argues that the State should not be able to rely on the doctrine to defeat exclusion where the police intentionally engaged in the misconduct that provides the basis for exclusion.

¶6 Accordingly, we must determine whether the inevitable discovery exception to the exclusionary rule applies only when the State proves the absence of bad faith by the officers who committed the constitutional violation. Like the Supreme Court of the United States, we conclude that the exception does not include such a requirement. Furthermore, because in this case we reexamine inevitable discovery for the first time since our decision in <u>Weber</u>, we also review the doctrine's analytical framework. We then apply the doctrine to the facts in this case and conclude that the State has proven by a preponderance of the evidence that officers inevitably would have discovered the physical evidence in dispute. Consequently, we affirm the decision of the court of appeals and remand to the circuit court for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

### A. Murder at the Hotel

¶7 At about 1:25 in the afternoon on February 21, 2012, officers from the Grand Chute Police Department were dispatched to the Road Star Inn located west of Appleton. The officers were advised that a male had been found in Room 114 lying face

down and covered in blood. When officers entered Room 114, they observed a bloody phone receiver detached from the phone near the door. Large blood smears covered the far wall, beyond the beds. Below the smears, officers found Derrick Whitlow lying prone against the wall. He had already been pronounced dead by paramedics. Whitlow had experienced significant injuries. An autopsy performed the next day showed that he suffered approximately 25 stab wounds. An eight-inch knife sheath bearing the word "Winchester" lay on the floor next to his body.

¶8 An employee on the hotel's cleaning staff told officers that she was doing the laundry in Room 111 between 1:00 and 1:30 p.m. She saw a person wearing a gray hooded sweatshirt knock on the door to Room 114. Because the sweatshirt's hood covered the visitor's head and face, the cleaning employee could not tell whether the person was male or female. After someone inside Room 114 let the person in, the employee heard a male voice screaming for help. The employee also heard sounds that she thought were a person being hit. She went to her manager to get help, and she subsequently saw the person in the sweatshirt leaving the hotel.

¶9 Based on the cleaning employee's report, the hotel manager entered Whitlow's room. He found Whitlow surrounded by blood and immediately called 911. When the officers arrived, the manager informed them that Whitlow had been staying at the hotel for a few days and that Whitlow's ten-year-old son, S.J., was staying at the hotel with him. The manager also indicated

4

to police that he understood Whitlow was having problems with his wife.

¶10 A hotel guest staying in Room 115 provided additional information to police about the afternoon's events. From his room, he heard a female voice yelling. Thinking the voice was that of the cleaning employee, he walked down the hallway to investigate. After seeing the cleaning employee and realizing that the yell came from someone else, he heard a loud scream near Room 114, followed by a male voice yelling "help me, help me." The guest then went to the manager's office to report the incident. Aside from the guest's comment about hearing a female voice yelling, neither the guest nor the manager nor the cleaning employee identified the sex or race of the person in the hooded sweatshirt.

### B. Officers Contact Jackson and R.L.D.J.

¶11 Shortly after 2 p.m., detectives from the Grand Chute Police Department began investigating the whereabouts of the child alleged to be staying with Whitlow. Unsure whether they might be dealing with a missing child case, the detectives attempted to locate Jackson, whom they believed to be the child's mother. They had received information indicating that Jackson resided at an address on Fourth Street in Appleton and that they might also find her at Harbor House.[2] The detectives

---

[2] Harbor House states its mission as "lead[ing] a community-wide partnership in the prevention of domestic violence and abuse, and to offer safety and support to diverse families in crisis." History of Harbor House, Harbor House, http://www.harborhouseonline.org/

(continued)

first went to Harbor House; there, they learned that Jackson had stayed overnight but left around 11 a.m.

¶12 Around 2:30 p.m., officers informed the detectives that a secretary at a local elementary school had confirmed S.J. was present at school but his older brother, 11-year-old R.L.D.J., was absent. R.L.D.J.'s whereabouts remained undetermined as the detectives proceeded from Harbor House to the Fourth Street address. They arrived between 2:30 and 3:00 p.m. Outside the residence, the detectives met with an officer from the Appleton Police Department who said he had not seen any people coming or going from the house. Officers remained at the Fourth Street location to observe the premises, and the detectives left to investigate another address associated with Jackson.

¶13 An officer arriving at the Fourth Street residence around 3:55 p.m. noticed the door to the residence begin to open. A man emerged from inside. The officer introduced himself to the man, who was working on the door's lock and identified himself as the building's landlord. He told the officer that Jackson had asked him to change her locks and that she was currently present in the house. Because the door remained ajar as the landlord worked, the officer observed Jackson and R.L.D.J. through the partially open door. Upon

history.html (last visited June 23, 2016). Harbor House's shelter program provides a safe space and emergency transportation for victims of domestic violence in the Appleton area.

seeing Jackson, the officer asked her to come to the door to speak with him outside. The detectives, returning to the Fourth Street residence shortly after 4 p.m., joined the officer at the door. Jackson gave the detectives consent to search the residence to determine whether there were other people inside, and their search confirmed that R.L.D.J. was present and safe.

¶14 Following the search, the detectives spoke briefly with Jackson outside before asking her to come with them to the Grand Chute Police Department. The officers patted her down and then drove her to the police department in the back seat of a squad car. In a separate car, officers also brought R.L.D.J. to the department. Jackson and R.L.D.J. left the residence with officers around 4:30 in the afternoon.[3]

### C. R.L.D.J.'s Interview

¶15 Officers began interviewing R.L.D.J. around 5:30 p.m., approximately an hour after he arrived at the department. An initial interview with R.L.D.J. lasted between 60 and 90 minutes, after which he and S.J. ate dinner together at the police station. A second interview ensued between 8 and 9 p.m. following a 60- to 90-minute dinner break.

¶16 During the second interview, officers informed R.L.D.J. about his father's death and pressed him for answers regarding his mother's whereabouts during the afternoon. R.L.D.J. emphatically denied repeated suggestions that he went

---

[3] Separately, an officer brought S.J. from his school to the police department between approximately 4:00 and 4:15 p.m.

7

to the Road Star Inn that day.  When R.L.D.J. asked whether his mother would go to jail, officers told him that she would not. Over and over, the officers asked R.L.D.J. to tell them the truth and to "do the right thing" to help his father.

¶17  Eventually, R.L.D.J. began providing information about the afternoon.  He acknowledged that his mother left the residence for 10 to 20 minutes at some point during the afternoon while he played video games.  According to R.L.D.J., his mother was angry with Whitlow because she discovered he had thrown away family photographs and other mementos.  Still playing video games when his mother returned home, R.L.D.J. heard the sound of a zipper and heard his mother take a shower immediately upon her arrival.  R.L.D.J. further indicated that his mother wore different clothes after her shower than she had worn earlier in the day.  He also disclosed that Jackson instructed him not to tell anyone that she had left the residence that afternoon.

### D.  Jackson's Interrogation

¶18 Jackson waited alone for nearly two hours in a separate room before detectives began questioning her at 6:24 p.m.  One of the detectives opened the questioning by telling Jackson that she was not under arrest, saying, "You know, you're not under arrest or, you know, you're free to go, you know."  When Jackson asked for clarification, the detective explained, "We just want to talk to you about some stuff that's going on.  We're investigating a couple things, OK, but like I said you're not under arrest or anything like that.  We just

8

want to talk to you and get some information to help us out, OK?"

¶19  The detectives began by questioning Jackson about the hours leading up to Whitlow's death.  Jackson explained that she had taken R.L.D.J. to spend the night at Harbor House after hearing noises outside their residence.  She mentioned that she had neither slept nor eaten much in recent days.

¶20  Gradually, the questioning transitioned to Jackson's relationship with Whitlow.  In response to the detectives' questions about the effect that stress had recently had upon her appetite and sleep, Jackson told them, "[M]y um husband, we've just been havin issues, um in a sense . . . ."  She claimed that she had experienced psychological mistreatment at his hands.  When the detectives asked whether "anything . . . happened in the last few days that has made this worse," she explained he had been with her at the house until four days before his death "cuz [she] was taking care of him" while his broken leg healed.[4]  After the two of them got into an argument, however, he asked her to take him to the Appleton police station, and he eventually rented a room at the Road Star Inn.  Because of Whitlow's broken leg, S.J. went to stay at the hotel to help his father.

---

[4] A few weeks before Whitlow's death, a vehicle operated by Jackson struck Whitlow, who suffered a broken leg as a result. Although officers from the Appleton Police Department were aware of this previous incident on the day of Whitlow's death, the affidavit in support of the search warrant for Jackson's residence made no mention of it.

¶21 Around 6:54 p.m., the conversation moved back to Jackson's activities after leaving Harbor House. Jackson told the detectives that she had gone to the hospital for a medical appointment but decided not to go inside because she arrived late and expected that the doctor would be unable to see her. Although she indicated that after going to the hospital she returned home and did not leave again, the detectives pressed her for more information about her afternoon. As the detectives asked whether she was "sure" that she had not left the house again until officers arrived to speak with her, she responded,

> No, I, I mean I, like, the question that [you're] all asking to me, I'm like, I guess I'm still just exhausted from not having sleep and haven't eaten and I'm sitting here and I want a ciggy and that's the last, that the thing that's really bothering me the most like I really want a cigarette and my stomach is starting to hurt, well it's been hurting but it's getting worser, and I'm talking to y'all and it's like, ahh, I just, I don't know, can I, can we do this another time?

(Emphasis added.) Shortly thereafter, she left the room at 7:04 accompanied by the detectives for a cigarette break.

¶22 Jackson returned from the break at 7:12 p.m., and she began conversing with the detectives again at 7:22 p.m. Video of the interrogation shows her sitting in her chair, doubled over in apparent pain while clutching her stomach as she waited for the detectives to return. When the detectives entered the room, they asked whether Jackson needed assistance for her obvious pain and discomfort. Jackson's response generated the following exchange:

10

[Jackson]: Yeah, I'm be fine, I'm just ready to go, I'm sleepy.  Can I leave and we do this another time[?]

[Detective Brad Kuehl]: Give me just one second, OK, just give me one second and I'll be right back with you.

[Jackson]: OK[.]

(7:23 p.m.) ([Det. Kuehl] leaves the room)

[Jackson]: I'm still thirsty I want some water but it's gonna hurt[.]

(7:23:51 p.m.) ([Det. Kuehl] re-enters the room)

[Det. Kuehl]: I just got a couple things I want to ask you real quick and then we'll try and get you on your way here, OK?

[Det. Kuehl]: Today when you were, when you left the Harbor House, is there anything else you can remember about anything else that you might have done[?]

[Jackson]: My tummy, I can't do this right now, my stomach hurts, nothing else was done.

(Emphasis added.)  After the detectives discussed acquiring medication for Jackson from her residence, another exchange occurred:

[Det. Kuehl]: I know you're, I you're kind of having some kind of stomach pains.  We're gonna try and get you some . . .

[Jackson]: Can I go home right now, please, I don't want to talk[.]

[Detective Scott Callaway enters the room]

[Det. Callaway]: Do you know where your purse [with the medication] is in the house[?]

[Jackson]: Yeah it's on my bed, can I go with you, can I just go home or do I have to stay[?]

11

[Det. Callaway]: Let me just make a phone call quick and I'll get right back to you[.]

[Jackson]: OK, OK.

(Emphasis added; ellipsis in original.)  This exchange occurred at 7:25 p.m.

¶23  The questioning continued for a few more minutes until just after 7:30 p.m., when the detectives left the interrogation room with Jackson.  They took her back to her residence, where she ingested prescription medication for her pain.  On the way back to the police department, they stopped at a Burger King to pick up food for her.  Just after 8:15 p.m., Jackson returned to the interview room at the police department, and one of the detectives resumed questioning at approximately 8:30 p.m.

¶24  Around 9:20 p.m., Jackson admitted being at the hotel in the afternoon and began describing the details of her interaction with Whitlow.  She said that Whitlow "came at [her]" when she entered the room.  Although she admitted that a confrontation occurred, she expressed an inability to recall the exact nature of what had happened.  When the detective asked about a knife, she conceded that she "may have" had one with her.  Jackson requested and was allowed to take additional medication around 9:37 p.m.

¶25 Over the succeeding hours, Jackson slowly gave the detectives more incriminating information about the events at the hotel.  Shortly after 10 p.m., she described a physical altercation with Whitlow and her efforts to get him off her.  She also confirmed that she took a shower and changed clothes

upon returning home.  Throughout the 10 o'clock hour, a detective insisted that she provide him with details about the events at the hotel.  At 11:09 p.m., she responded to a question about a knife, saying,

> I don't . . . will you just do me a favor and tell my kids that I truly do love them and I'm sure they know that, but just tell them again, I truly do love them and I'm done.  Cause I don't, I don't want to talk no more, I don't want to say anything, cause I don't, I just whatever's gonna happen, gonna happen and I don't wanna see kids, I don't, I can't, cause I don't wanna force myself to think about things.

(Emphasis added; ellipsis in original.)  Jackson repeatedly stated that she did not want to think about the events at the hotel, that doing so would "torture" her.  As she phrased it at 11:17 p.m., "[T]o know that I'm the reason he not here. . . .  No thank you, I'd rather not think about it."

¶26 At 11:20 p.m., a detective began reviewing medical consent forms for R.L.D.J. and S.J. with Jackson and asked her to sign them.  At 11:45 p.m., detectives read her a search warrant[5] and explained that they would extract blood and fingernail samples from her and that they would also take pictures of bruising on her body.  At 12:17 a.m., a detective

---

[5] Officers obtained separate warrants to search Jackson's home and to search her person.

told her she would be charged with first-degree reckless homicide.[6]

¶27 Finally, at 12:39 a.m., a detective read a <u>Miranda</u> warning advising Jackson of her constitutional rights. When Jackson, thinking the detective had already advised her of her rights, asked for clarification about the charge she faced, the detective responded:

> Can I, can I read this to you first because <u>I technically can't get into a lot of stuff without until I advise you of these</u> and you decide whether or not you want to talk to me anymore, OK because I can't violate your rights, do you know what I mean? So can I read this to you and then you decide whether or not you want to talk to me because <u>I can't really get into any in depth conversation with you until you either tell me yes or no that you're willing to talk to me</u>. So let me read this to you and then you decide what you want to answer and we'll go from there and then anything I can answer for you I'll answer, presuming you want to talk to me. Sound fair?

(Emphasis added.) The detective read a waiver-of-rights form to her and then explained each of her rights in detail. To conclude the explanation, the detective said, "So say you decide to start talking to me but at some point you decide you don't want to talk to me, you can just tell me you don't want to talk to me anymore." Jackson's first response to hearing that example was to begin asking, "So earlier, when you, when you wouldn't let me leave . . . ," then the detective cut her off.

---

[6] The detective misstated the expected charge at 12:17 a.m. When giving Jackson the <u>Miranda</u> warning at 12:39 a.m., the detective correctly told her that she faced a charge for "[f]irst degree intentional homicide."

14

Ultimately, Jackson continued talking with the detectives at the department until 2:01 a.m. on February 22.

### E.   Officers Obtain a Warrant and Search Jackson's Residence

¶28   Around 6 p.m., an officer began preparing a warrant to search Jackson's residence.  The  affidavit that accompanied the warrant included information from officers responding to the hotel, from R.L.D.J.'s interview with officers, and, in a concluding paragraph, from Jackson's interrogation.  A judge signed the warrant at 11:32 p.m.

¶29  Officers arrived at Jackson's residence after midnight to conduct the search and began searching around 12:50 a.m.  At least six officers were present.  Four officers began searching the basement, while others searched upstairs.  From the beginning, officers planned to search the entire house, followed by the garage.  The officers later testified that, because of the serious nature of the crime, they intended "to be very thorough" and "to search everywhere and anywhere that [they] could search looking for relevant items."

¶30  Officers further testified that they searched in a systematic and "[e]xtremely thorough" manner, carefully sorting through boxes, bags, and drawers in each room.  They explained that the search was "time consuming" and "took quite a while" because "[t]here was a lot of stuff in the house," particularly a bedroom closet filled with large garbage bags packed with various items.  Because the garage contained numerous boxes and bins, the officers expected that searching the garage would require a significant amount of time as well.

15

¶31 During the search, an officer in the basement received information from the detectives interrogating Jackson that a knife and bloody clothing might be in a garbage container in the garage. The officer took a break from searching the basement and went to the garage, where he searched a garbage container inside the main door and another outside the door. Unable to find anything of evidentiary value in those containers, the officer went back inside "to finish the searching of the basement to keep everything systematic and as thorough as possible."

¶32 At approximately 2:15 a.m., detectives brought Jackson from the police department to her residence. Before officers finished their methodical search of the premises, Jackson showed them a garbage can in the garage containing the knife and the clothing she wore at the hotel.

## II. PROCEDURAL HISTORY

¶33 On February 23, 2012, the State filed a criminal complaint against Jackson in Outagamie County Circuit Court. The complaint charged Jackson with one count of first-degree intentional homicide, domestic abuse, contrary to Wis. Stat. §§ 940.01(1)(a), 939.50(3)(a), and 968.075(1)(a), and one count of misdemeanor bail jumping, contrary to Wis. Stat. §§ 959.49(1)(a) and 939.51(3)(a).

¶34 Jackson filed a motion to suppress all statements that she made to the officers and all physical evidence derived from those statements. She argued that her statements were involuntary and that law enforcement officers violated her

constitutional rights by taking her statements at the police department without reading <u>Miranda</u> warnings to her. Because officers procured the warrant to search her home based in part on the statements obtained in violation of her constitutional rights, she argued that any physical evidence at her residence——particularly the knife and the clothing——was inadmissible fruit of the poisonous tree.

¶35 At a series of hearings, the Outagamie County Circuit Court[7] developed an extensive record as it considered Jackson's suppression motion. The court heard testimony about the investigation from several officers and detectives, who provided detailed accounts of Jackson's interrogation and the search of her home. Jackson presented testimony from a toxicologist and a psychologist, who testified about Jackson's state of mind during the interrogation and the effects of medication she was taking at the time. Additionally, the court reviewed video and a transcript of Jackson's interrogation, as well as an audio recording of the interview with R.L.D.J.

¶36 In a comprehensive ruling from the bench on June 16, 2014, the circuit court ordered suppression of most of Jackson's statements, as well as suppression of the physical evidence obtained from her residence in the early morning hours on February 22, 2012. Specifically, the court found that Jackson was in custody for <u>Miranda</u> purposes at 7:25 p.m. The court

---

[7] Mark J. McGinnis, Judge.

17

leveled substantial criticism at the officers and detectives carrying out the investigation:

> There's been some variation of the officers' testimony that at that point in time [during her interrogation] Ms. Jackson was free to leave. I find that incredible. I find it difficult to believe, and I'm somewhat offended by officers who come into court, raise their hand to testify, and try to suggest that in a murder case where they put somebody in the back seat of the squad car and they take them to the police station and asking that they can leave and they're not answering her questions on that issue, that she was truly free to leave. It reduces their credibility in my eyes in the overall grand scheme of things. . . . [T]he officers' insistence on a theory and trying to maintain the standard that said at that point in time she could get up and walk out is just incredible. . . .
>
> . . . .
>
> . . . I'll never forget how appalled I was and how upsetting it was that this stuff happens in today's world. . . . I've never seen a case, been part of a case, or heard of a case that's worse than this in terms of what the police officers did in that interrogation room. . . . [T]his is just a clear violation of somebody's rights over a long period of time involving many different officers with lots of opportunities to have one of them step up and say, hey, this is not the way we need to do this.
>
> . . . .
>
> . . . [T]his is textbook interrogation of what not to do if you want to be doing good police work and get stuff admitted in during a hearing.
>
> . . . [T]hese violations in my opinion were done intentionally, they were done flagrantly, they were done recklessly; and they were done without any concerns involving Ms. Jackson's rights, her constitutional rights, her statutory rights, and it was done in an effort to get something out of her

18

before those rights were read, and that's exactly what happened eventually.

¶37 Based on its finding that Jackson was in custody beginning at 7:25 p.m., the court suppressed all statements that Jackson made from that time until she received a Miranda warning at 12:39 a.m. Relying on Missouri v. Seibert, 542 U.S. 600 (2004), the court further suppressed all statements Jackson made after receiving the Miranda warnings, "includ[ing statements made during] the time when she was taken back to her home and pointed out to the officers where they would find both the weapon and the clothing associated with this case." In addition, the court concluded that Jackson's statements were involuntary.

¶38 Although the court expressed additional "concern[] about things that were done and said during th[e] interview" with R.L.D.J., the court declined to suppress any of R.L.D.J.'s statements. The court noted that "there was nothing that Ms. Jackson [said] that was then used to get [R.L.D.J.] to talk."

¶39 However, the court did suppress the physical evidence of the knife and the clothing as illegal fruit of the poisonous tree. After striking Jackson's suppressed statements from the search warrant affidavit, the court concluded that the evidence from the hotel and R.L.D.J.'s statements did not create probable cause for a court to issue the warrant. The court further determined that "even if the warrant had probable cause," the State had not proven that the officers conducting the search inevitably would have discovered the knife and clothing that

19

Jackson ultimately revealed.  Emphasizing the deterrent purpose of the exclusionary rule, the court reasoned that "when officers are simply looking for evidence of the crime, it's not good policy to . . . provide them the benefit of the doubt when they violate somebody's constitutional rights."

¶40  On appeal, the State did not challenge suppression of Jackson's statements but did seek reversal of the circuit court's decision suppressing the physical evidence.  The State argued that the untainted portions of the search warrant affidavit established probable cause to search Jackson's residence and that the officers conducting the search inevitably would have discovered the knife and clothing in Jackson's garage.

¶41  The court of appeals agreed with the State and reversed the circuit court's decision with respect to the knife and clothing.  State v. Jackson, 2015 WI App 49, 363 Wis. 2d 554, 866 N.W.2d 768.  In its penetrating analysis, the court of appeals first examined the search warrant affidavit and excised all facts derived from Jackson's suppressed statements. Id., ¶¶17-18.  Based on the remaining evidence from the hotel and from R.L.D.J., the court of appeals determined that the affidavit still "provided a substantial basis to conclude there was a fair probability a search of Jackson's residence would uncover evidence of wrongdoing."  Id., ¶¶19-20 (citing State v. Romero, 2009 WI 32, ¶3, 317 Wis. 2d 12, 765 N.W.2d 756).

¶42  Given that the officers conducted the search pursuant to a valid warrant, the court of appeals next concluded that the

20

officers inevitably would have discovered the knife and clothing.  Id., ¶¶22, 43.  Applying a framework set forth in its previous cases, the court of appeals conducted a three-pronged analysis for the inevitable discovery exception to the exclusionary rule:

> To establish that the evidence would have been inevitably discovered, the State must demonstrate, by a preponderance of the evidence, that: (1) there is a reasonable probability the evidence in question would have been discovered by lawful means but for the police misconduct; (2) the leads making the discovery inevitable were possessed by the government at the time of the misconduct; and (3) prior to the unlawful search the government also was actively pursuing some alternative line of investigation.

Id., ¶23 (citing State v. Avery, 2011 WI App 124, ¶29, 337 Wis. 2d 351, 804 N.W.2d 216).  The court concluded that the State met the first prong because officers "intended to conduct a thorough and methodical search of Jackson's house and garage that would have entailed examining every container or compartment that might have contained evidence of the crime." Id., ¶¶25-32.  Jackson did not dispute the State's argument that it met the second prong——that it had leads making the discovery inevitable——so the court deemed the point conceded.  Id., ¶35. Finally, the court concluded that by actually "conducting a thorough and methodical search of [Jackson's] residence pursuant to a valid warrant," the officers met the third prong's requirement of active pursuit of another line of inquiry.  Id., ¶39.

21

¶43 Additionally, the court of appeals rejected Jackson's argument that the inevitable discovery doctrine should not apply in cases involving intentional constitutional violations. Id., ¶¶43, 48. Jackson relied on this court's decision in State v. Knapp, 2005 WI 127, 285 Wis. 2d 86, 700 N.W.2d 899, suppressing physical evidence obtained as a direct result of an intentional Miranda violation. Jackson, 363 Wis. 2d 554, ¶43. The court of appeals distinguished Knapp, observing that no evidence in that case indicated that officers had alternative means to discover the physical evidence. Id., ¶45. Suppression, moreover, would place the State "in a worse position than it would have been in absent the Miranda violation" because the officers would have obtained a warrant even without the unconstitutional interrogation. Id., ¶47.

¶44 Jackson filed a petition for review on June 18, 2015, which this court granted on October 8, 2015.

### III.  STANDARD OF REVIEW

¶45 Application of constitutional principles in a particular case presents a question of constitutional fact. State v. Dearborn, 2010 WI 84, ¶13, 327 Wis. 2d 252, 786 N.W.2d 97 (citing State v. Pallone, 2000 WI 77, ¶26, 236 Wis. 2d 162, 613 N.W.2d 568). This court accepts the circuit court's findings of fact unless they are clearly erroneous, but application of constitutional principles to those facts is a question of law that this court reviews de novo. Id. (citing Pallone, 236 Wis. 2d 162, ¶27).

### IV.  DISCUSSION

¶46 Exclusion is a judicial remedy that can apply when the government obtains evidence as a result of a constitutional violation. See Dearborn, 327 Wis. 2d 252, ¶15 (citing State v. Eason, 2001 WI 98, ¶¶39-45, 245 Wis. 2d 206, 629 N.W.2d 625). "The exclusionary rule . . . may apply to deter violations of the Fourth Amendment, Fifth Amendment, or Sixth Amendment." State v. Scull, 2015 WI 22, ¶64, 361 Wis. 2d 288, 862 N.W.2d 562 (Ziegler, J., concurring) (footnotes omitted); id., ¶¶64-65 (citing examples under each Amendment from cases in the Wisconsin and United States Supreme Courts). However, exclusion is not an absolute, automatic remedy. Dearborn, 327 Wis. 2d 252, ¶35 (first citing Herring v. United States, 555 U.S. 135, 140-42 (2009); then citing Arizona v. Evans, 514 U.S. 1, 10-11 (1995)). Courts exclude evidence only when the benefits of deterring police misconduct "outweigh the substantial costs to the truth-seeking and law enforcement objectives of the criminal justice system." Id., ¶38.

¶47 The Supreme Court approved the inevitable discovery exception to the exclusionary rule in Nix v. Williams, 467 U.S. 431 (1984). Under the inevitable discovery doctrine, "evidence obtained during a search which is tainted by some illegal act may be admissible if the tainted evidence would have been inevitably discovered by lawful means." State v. Lopez, 207 Wis. 2d 413, 427, 559 N.W.2d 264 (Ct. App. 1996) (citing State v. Schwegler, 170 Wis. 2d 487, 499, 490 N.W.2d 292 (Ct. App. 1992)); see also 6 Wayne R. LaFave, Search and Seizure § 11.4(a), at 339 (5th ed. 2012) ("[T]he question is not whether

23

the police did in fact acquire certain evidence by reliance upon an untainted source but instead whether evidence found because of a Fourth Amendment violation would inevitably have been discovered lawfully." (footnote omitted)).

¶48 Although the court of appeals has decided multiple inevitable discovery cases, see, e.g., Avery, 337 Wis. 2d 351; Lopez, 207 Wis. 2d 413; Schwegler, 170 Wis. 2d 487, this court has not conducted a comprehensive examination of the doctrine since the Supreme Court decided Nix. The present case affords us an opportunity to evaluate the conditions that must exist for the State to demonstrate that it inevitably would have discovered evidence despite the fact that officers actually obtained the evidence as a result of a constitutional violation. Accordingly, we begin our analysis by examining the development and purposes of the doctrine.

### A.  The Inevitable Discovery Doctrine

#### 1.  Nix v. Williams

¶49 Nix involved a suspect, Williams, who surrendered to authorities in Davenport, Iowa, after allegedly abducting and murdering a young girl in Des Moines. Nix, 467 U.S. at 434-35. Two Des Moines detectives drove to Davenport to transport Williams back to Des Moines. Id. at 435. Counsel was not permitted to accompany Williams during his ride in the back seat of the detectives' car, but the detectives informed Williams's attorney that they would not question the suspect during the drive. Id. Nonetheless, as they drove, one of the detectives made comments encouraging Williams to reveal the location of the

24

victim's unrecovered remains. Id. at 435-36. The detective insinuated that the little girl deserved a prompt "Christian burial" before an approaching winter storm made it impossible for searchers to find her body. Id. Eventually, the suspect agreed to lead officers to the body, which they found "next to a culvert in a ditch beside a gravel road"——"essentially within [an] area to be searched" by a nearby search party independently looking for the missing child. Id. at 436.

¶50 The Williams prosecution led to two trials, two appeals to the Supreme Court of Iowa, two collateral attacks in federal court, and two decisions from the Supreme Court of the United States. See Brewer v. Williams, 430 U.S. 387 (1977); Nix, 467 U.S. 431. After the second trial and appeal, the Eighth Circuit determined that Iowa authorities had erred by failing to suppress evidence of the little girl's body.[8] The Supreme Court reversed. In an opinion by Chief Justice Burger, the Court discussed both the purpose of the exclusionary rule and the independent source doctrine, which allows "admission of evidence that has been discovered by means wholly independent of any constitutional violation." Nix, 467 U.S. at 443.

¶51 The purpose of the exclusionary rule, the Court said, is to prevent the prosecution from being "put in a better position than it would have been in if no illegality had transpired." Id. However, it does not follow that the

---

[8] Williams v. Nix, 700 F.2d 1164 (8th Cir. 1983).

exclusionary rule should put the prosecution "in a worse position simply because of some earlier police error or misconduct." Id. The independent source doctrine allows evidence "wholly independent of any constitutional violation" to be admitted.

¶52 The inevitable discovery doctrine is not the same as the independent source doctrine, the Court explained, but it is "closely related" because evidence that inevitably will be discovered is like evidence from an independent source. "There is a functional similarity between these two doctrines in that exclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained the evidence if no misconduct had taken place." Id. at 443-44. Thus, the rationale of the independent source doctrine "is wholly consistent with and justifies . . . adoption of the ultimate or inevitable discovery exception to the exclusionary rule." Id. at 444.

¶53 Emphasizing the deterrence rationale underlying the exclusionary rule, the Court phrased its test for inevitable discovery as follows: "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." Id.

¶54 To support its use of a "preponderance of the evidence" standard, the Court relied on its previous determination that "the controlling burden of proof at

suppression hearings should impose <u>no greater burden</u> than proof by a preponderance of the evidence." <u>Id.</u> at 444 n.5 (quoting <u>United States v. Matlock</u>, 415 U.S. 164, 178 n.14 (1974)).  The Court added that it was "unwilling to impose added burdens on the already difficult task of proving guilt in criminal cases by enlarging the barriers to placing evidence of unquestioned truth before juries." <u>Id.</u>  In any case, proving that discovery of evidence was truly <u>inevitable</u> "involves no speculative elements but focuses on <u>demonstrated historical facts</u> capable of ready verification or impeachment." <u>Id.</u> at 445 n.5 (emphasis added).

¶55 Further, the Court rejected any notion that the government must prove the absence of bad faith by the police in order to qualify for the inevitable discovery exception. <u>Id.</u> at 445.  The Court emphasized the "enormous societal cost" that flows from "plac[ing] courts in the position of withholding from juries relevant and undoubted truth that would have been available to police absent any unlawful activity." <u>Id.</u>  Seeing no merit in the argument that officers would deliberately violate Sixth Amendment rights if the inevitable discovery exception did not require proof of good faith, the Court observed that an "officer who is faced with the opportunity to obtain evidence illegally will rarely, if ever, be in a position to calculate whether the evidence sought would inevitably be discovered." <u>Id.</u> at 445-46.  On the contrary, "[s]ignificant disincentives" always discourage officers from engaging in misconduct; officers might face not only suppression of illegally obtained evidence but also "departmental discipline

27

and civil liability" when they violate suspects' constitutional rights.  Id. at 446.

### 2.  Inevitable Discovery in Wisconsin

#### a.  Wisconsin Cases After Nix

¶56  This court first applied the Nix exception in State v. Weber, 163 Wis. 2d 116, 471 N.W.2d 187 (1991), where a defendant argued that police officers conducted an unreasonable search when they listened to a cassette tape containing the defendant's confession that they obtained while taking inventory of his car's contents.  Weber, 163 Wis. 2d at 121.  Conducting a short inevitable discovery analysis, this court began by stating that, under Nix, "if it can be shown by a preponderance of the evidence that the tape would have inevitably been discovered absent any constitutional violation, the tape may be admitted into evidence."  Id. at 140-41 (first citing Nix, 467 U.S. 431; then citing State v. Kennedy, 134 Wis. 2d 308, 318, 396 N.W.2d 765 (Ct. App. 1986)).  The court then briefly recounted various pertinent facts and concluded that, even assuming the officers conducted an illegal search by playing the tape, the facts demonstrated that the police "would inevitably have obtained a warrant to play the tape" and discover its contents. Id.  Quoting from Nix, the court also reasoned that suppressing the evidence would place the prosecution in a worse position than it would have been in absent an illegal search.  Id. at 142.

¶57 Notably, in Weber this court did not conduct an extensive evaluation of Nix or of the reasoning underlying the

28

Supreme Court's adoption of the inevitable discovery exception. Since Weber, this court has periodically cited Nix, but we have not expounded on the inevitable discovery exception and its proper application in Wisconsin.

¶58 The court of appeals, however, has decided multiple inevitable discovery cases since Nix. A few months after the Supreme Court decided Nix, the court of appeals decided State v. Washington, 120 Wis. 2d 654, 358 N.W.2d 304 (Ct. App. 1984). As this court would later do in Weber, the Washington court used the Nix Court's phrasing of the test for the exception, stated relevant facts from the case, and then concluded that those facts demonstrated sufficient inevitability of discovery for the exception to apply. Washington, 120 Wis. 2d at 664-65 (determining that officers inevitably would have discovered evidence in back seat of defendant's vehicle when officers legally stopped the vehicle but illegally arrested defendant and searched his person). Similarly, in Kennedy, the court of appeals cited Washington when phrasing the doctrine as follows: "[T]he fruits of an illegal search may be admitted if it can be shown by a preponderance of the evidence that the tainted fruits would have been inevitably discovered by lawful means." Kennedy, 134 Wis. 2d at 317 (concluding that a vodka bottle discovered in a vehicle would inevitably have been discovered during an inventory search even though it was actually discovered pursuant to a defective warrant). The court added: "The defective search warrant does not compel exclusion of evidence that would otherwise have been lawfully discovered and

29

admissible in evidence.  Individual rights are not controverted, nor is the public served, by excluding such evidence."  Id. at 318 (citing Washington, 120 Wis. 2d at 664-65).  The opinion did not cite Nix.

¶59 After this court applied Nix in Weber, the court of appeals decided State v. Schwegler, 170 Wis. 2d 487, 490 N.W.2d 292 (Ct. App. 1992), which arose after a Waukesha County humane officer inspected a licensed horse-breeding operation when the owners were not present.  Schwegler, 170 Wis. 2d at 492-93.  A provision of the Waukesha County Code permitted inspection of licensed premises "at any time" by county humane officers.  Id. at 492.  The humane officer arrived at the premises and found the door to the barn partially ajar.  Id. at 493.  She opened the door to conduct a routine inspection, as she had before, and discovered evidence of abuse of the horses. Id.  The following day, she returned with law enforcement officers, who seized the horses in the presence of the owners. Id.

¶60 The court of appeals concluded that the warrantless initial search of the barn was illegal and rejected the State's argument that, despite the illegal search, the inevitable discovery doctrine defeated suppression of evidence from the barn.  Although the court cited the language from Kennedy quoted above, it established a new test for inevitable discovery:

> To [prove inevitable discovery], the prosecution must demonstrate: (1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (2) that

30

the leads making discovery inevitable were possessed by the government at the time of the misconduct; and (3) that prior to the unlawful search the government also was actively pursuing some alternate line of investigation.

Id. at 500 (citing United States v. Cherry, 759 F.2d 1196, 1204 (5th Cir. 1985)). The court provided no explanation why it chose to apply the Fifth Circuit's test for inevitable discovery. Neither the State nor the Schweglers cited Cherry's three-pronged test in their briefs to the court of appeals. The State primarily relied upon Nix but cited Weber and Kennedy as well, and the Schweglers discussed both Nix and Kennedy. The court of appeals has applied Schwegler's three-pronged analysis in subsequent inevitable discovery cases. Avery, 337 Wis. 2d 351, ¶29; Lopez, 207 Wis. 2d at 427-28.

b.  The Active Pursuit Requirement

¶61 Because our decision in Weber is this court's only precedent applying the inevitable discovery exception, we examine the Fifth Circuit test adopted by the court of appeals in Schwegler before determining whether the exception applies under the facts of this case. The three-pronged Cherry analysis derived from the Fifth Circuit's pre-Nix precedent. Cherry, 759 F.2d at 1204. Reasoning that in Nix "no attempt was made . . . to define the contours" of the exception, the Cherry court turned to "previous circuit case law, to the extent it [was] consistent with the principles enunciated" in Nix. Id. Based on its own decision in United States v. Brookins, 614 F.2d 1037 (5th Cir. 1980), the Fifth Circuit in Cherry concluded that using the "three-prong" framework would be "fully consistent

31

with Nix."  Id. (citing Brookins, 614 F.2d at 1042 n.2).  In United States v. Satterfield, 743 F.2d 827 (11th Cir. 1984), the Eleventh Circuit——which had adopted the Fifth Circuit's Brookins rule in United States v. Roper, 681 F.2d 1354, 1358 (11th Cir. 1982)——similarly concluded that "Nix is not inconsistent with the rule in this circuit that the police must possess and be actively pursuing the lawful avenue of discovery when the illegality occurred."  Satterfield, 743 F.2d at 847.

¶62 Requiring the prosecution to prove active pursuit of an alternative line of investigation under the third prong of the Cherry test may apply the inevitable discovery exception more strictly than the Supreme Court required in Nix:

> While some courts have taken the position that the inevitable discovery doctrine applies only where "the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation," such an absolute limitation is unsound, as it "allows for the exclusion of evidence that inevitably would have been discovered."

6 LaFave § 11.4(a), at 365-68 (footnote omitted) (first quoting United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997); then quoting United States v. Thomas, 524 F.3d 855, 862 (8th Cir. 2008) (Colloton, J., concurring)).  A footnote in Professor LaFave's treatise explains the circumstances under which discovery might be inevitable despite the absence of active pursuit prior to the misconduct: "Even if the police were not actively pursuing an alternative line of investigation at the time of police error or misconduct, for example, the government may well be able to establish that the execution of routine

police procedure or practice inevitably would have resulted in discovery of disputed evidence."  Id. § 11.4(a) n.164, at 368 (quoting Thomas, 524 F.3d at 862 (Colloton, J., concurring)).

¶63 To a degree, the Cherry court anticipated this critique by acknowledging a case in which, despite the fact that "the Brookins prerequisites were not met," the Fifth Circuit "held that the inevitable discovery exception applied since the alternate means for obtaining the evidence was an intervening and independent event occurring subsequent to the misconduct." Cherry, 759 F.2d at 1205 (citing United States v. Miller, 666 F.2d 991, 997 (5th Cir. 1982)).  Indeed, the Fifth Circuit in Cherry concluded its analysis of the inevitable discovery exception by stating:

> In certain circumstances . . . , such as when the hypothetical independent source comes into being only after the misconduct, the absence of a strong deterrent interest may warrant the application of the inevitable discovery exception without a showing of active pursuit by the government in order to ensure that the government is not unjustifiably disadvantaged by the police misconduct.

Id. at 1206.  Although the court of appeals in Schwegler applied the three-pronged framework set forth in Cherry, it did not acknowledge any exceptions to the active pursuit requirement.

¶64 Other jurisdictions apply alternative, fact-intensive versions of the inevitable discovery exception that do not require proof of active pursuit in all cases.  See United States v. Howard, 729 F.3d 655, 663 (7th Cir. 2013) ("The government must demonstrate both (1) that 'it had, or would have obtained,

33

an independent, legal justification for conducting a search that would have led to discovery of the evidence' and (2) 'that it would have conducted a lawful search absent the challenged conduct.' (quoting United States v. Marrocco, 578 F.3d 627, 637-38 (7th Cir. 2009)); United States v. Boatwright, 822 F.2d 862, 864-65 (9th Cir. 1987) (concluding that "[t]he doctrine is best developed on a case by case basis" and that "[t]he existence of two independent investigations at the time of discovery is not . . . a necessary predicate to the inevitable discovery exception," but adding that "[a]bsent some overriding considerations . . . , the doctrine requires that the fact or likelihood that makes the discovery inevitable arise from circumstances other than those disclosed by the illegal search itself"); United States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986) ("[T]here are three basic concerns which surface in an inevitable discovery analysis: are the legal means truly independent; are both the use of the legal means and the discovery by that means truly inevitable; and does the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken fourth amendment protection?").

¶65 Demonstrated historical facts proving active pursuit of an alternative line of investigation at the time of the constitutional violation certainly help the State to substantiate its claim that discovery of otherwise excludable evidence was inevitable. However, requiring proof in all cases of active pursuit at the time of the constitutional violation

34

risks exclusion of evidence that the State might demonstrate that it inevitably would have discovered. For instance, a constitutional violation may occur so quickly after the commission of a crime that there has not been time to launch the kind of comprehensive investigation that would be normal operating procedure.

¶66 Consequently, we think that the better approach is to follow the analysis applied by this court in Weber and by the court of appeals in Washington and in Kennedy: Has the prosecution met its burden of proving by a preponderance of the evidence that it inevitably would have discovered the evidence sought to be suppressed? Accordingly, the factors in Schwegler, Lopez, and Avery should be regarded as important indicia of inevitability rather than indispensable elements of proof.

c.  Proof of the Absence of Bad Faith

¶67 We also decline Jackson's invitation to articulate a rule prohibiting application of the inevitable discovery exception when the State fails to prove the absence of bad faith on the part of officers who committed the constitutional violation. Although in Nix the Supreme Court expressly rejected the necessity for a good faith requirement, Nix, 467 U.S. at 445, Jackson contends that the Wisconsin Constitution provides greater protections than does the federal constitution in this context, see State v. Knapp, 2005 WI 127, ¶59, 285 Wis. 2d 86, 700 N.W.2d 899 (citing State v. Doe, 78 Wis. 2d 161, 171, 254 N.W.2d 210 (1977)).

35

¶68 The Court's decision in Nix rejecting proof of absence of bad faith as a necessary condition for inevitable discovery has provided an avenue for criticism of the doctrine. "Because one purpose of the exclusionary rule is to deter . . . shortcuts, there is much to be said for the proposition that the 'inevitable discovery' rule should be applied only when it is clear that 'the police officers have not acted in bad faith to accelerate the discovery' of the evidence in question."  6 LaFave § 11.4(a), at 344-46 (quoting Brian S. Conneely & Edmond P. Murphy, Comment, Inevitable Discovery: The Hypothetical Independent Source Exception to the Exclusionary Rule, 5 Hofstra L. Rev. 137, 160 (1976)).  In her brief, Jackson cites cases from other jurisdictions that have adopted rules precluding application of the exception when the prosecution fails to prove the absence of bad faith.  See Smith v. State, 948 P.2d 473, 481 (Alaska 1997); Commonwealth v. Sbordone, 678 N.E.2d 1184, 1190 (Mass. 1997); State v. Holly, 833 N.W.2d 15, 33 (N.D. 2013).

¶69 It gives us pause to consider the possibility that officers could intentionally violate constitutional rights as a "shortcut" to obtaining evidence when they know the State will be able to demonstrate inevitable discovery by other means.  We are particularly mindful of this possibility as we decide a case in which the circuit court and court of appeals, respectively, rebuked officers for "flagrant" and "reprehensible" violations of Jackson's rights——rebukes, we believe, that were warranted and appropriate.

36

¶70 Nevertheless, we conclude that Jackson has not demonstrated that the Wisconsin Constitution requires proof of the absence of bad faith as a necessary condition for the prosecution to establish inevitable discovery of otherwise excludable evidence.    Because inevitable discovery is an exception to the exclusionary rule, it necessarily applies after some government misconduct has occurred that would otherwise justify the suppression of evidence as an appropriate remedy. See United States v. Alexander, 540 F.3d 494, 503-04 (6th Cir. 2008).    In the exceptional case where the government meets its burden of proving inevitability, however, it will have demonstrated that suppression would place the State in a worse position than it would have been in absent the misconduct. Insisting on suppression of evidence obtained by intentional misconduct would redirect the exclusionary rule to a punitive purpose——punishing the State and the public for misconduct by some officers despite independent proof of inevitable discovery of the relevant evidence.

¶71 We are not persuaded that allowing the State to prove inevitable discovery without proving the absence of bad faith will encourage officers to take unconstitutional shortcuts to accelerate the acquisition of evidence.    An officer who intentionally commits a constitutional violation always risks losing valuable evidence, and "[a] police officer who is faced with the opportunity to obtain evidence illegally will rarely,

37

if ever, be in a position to calculate whether the evidence sought would inevitably be discovered." Nix, 467 U.S. at 445.[9] Already, the exception applies only if the State proves that it inevitably would have discovered the disputed evidence without the misconduct.    As the Supreme Court explained in Nix, "When . . . the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible."   Nix, 467 U.S. at 448.   Conversely, "If the State finds itself in any situation where it must prove that the evidence inevitably would have been discovered by other legal, independent means, and it fails to do so, the doctrine is not applied and the evidence is suppressed."  State v. Garner, 417 S.E.2d 502, 511 (N.C. 1992).

¶72 In declining to impose a good faith requirement in connection with inevitable discovery, we emphasize that the State has the burden of proof in satisfying this narrow exception to the exclusionary rule.   As the Seventh Circuit observed,

> Nix . . . speaks in terms of proof by preponderance of the evidence that the government would have discovered the challenged evidence through lawful means . . . . Inevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing

---

[9] Cf. Murray v. United States, 487 U.S. 533, 540 (1988) ("[T]he officer without sufficient probable cause to obtain a search warrant [would not] have any added incentive to conduct an unlawful entry, since whatever he finds cannot be used to establish probable cause before a magistrate.").

38

> the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof.

United States v. Jones, 72 F.3d 1324, 1334 (7th Cir. 1995). Proof of inevitable discovery turns upon demonstrated historical facts, not conjecture.

¶73 With these principles of the inevitable discovery exception in mind, we now consider its application in this case.

### B.  Officers Inevitably Would Have Discovered the Evidence in Jackson's Residence

¶74 On appeal, the State has not challenged the circuit court's determination that the detectives intentionally violated Jackson's constitutional rights during her interrogation and by subsequently bringing her to her home to locate physical evidence.   The officers failed to provide timely Miranda warnings, failed to respond timely to her physical condition, and failed to respond to her expressed desire not to continue talking, thereby raising obvious concerns about the voluntariness of her admissions.  Suppression of her statements to police was necessary and "inevitable" under the circumstances presented.   Thus, resolution of this case requires us to determine whether the State has established by a preponderance of the evidence that Jackson's knife and her bloody clothing would inevitably have been discovered by lawful means but for the police misconduct.

¶75 After assessing the substantial evidence presented by the State regarding the search warrant and ensuing search, the demonstrated historical facts leave us reasonably certain that

officers would inevitably have discovered the physical evidence in Jackson's garage without any of the information unlawfully obtained from her.

¶76 Both the circuit court and the court of appeals in this case evaluated the search warrant affidavit——excised of information gained from the illegal interrogation of Jackson——to determine whether it provided probable cause to justify a search of Jackson's residence.  This court has held that "where an application for a warrant contains both tainted and untainted evidence, the issued warrant is valid if the untainted evidence is sufficient to support a finding of probable cause to issue the warrant."  State v. Carroll, 2010 WI 8, ¶44, 322 Wis. 2d 299, 778 N.W.2d 1 (first citing Murray v. United States, 487 U.S. 533, 542 (1988); then citing State v. O'Brien, 70 Wis. 2d 414, 424-25, 234 N.W.2d 362 (1975)); see also United States v. Karo, 468 U.S. 705, 719 (1984) ("[I]f sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid." (citing Franks v. Delaware, 438 U.S. 154, 172 (1978)); State v. St. Martin, 2011 WI 44, ¶30, 334 Wis. 2d 290, 800 N.W.2d 858.

¶77 Like the circuit court and court of appeals, we consider untainted portions of the search warrant affidavit.  A single paragraph at the end of the affidavit summarizes Jackson's incriminating statements indicating that she traveled to the hotel that afternoon and got into a confrontation with Whitlow while armed with a knife.  We examine the remaining portions of the affidavit, which is reproduced in the Appendix.

40

¶78 The vast majority of factual information set forth in the affidavit accompanying the search warrant application was derived from untainted sources. In the underlying opinion in this case, the court of appeals accurately and comprehensively summarized the information set forth in the untainted portions of the affidavit:

- At 1:25 p.m. on February 21, 2012, officers were dispatched to the Road Star Inn in Grand Chute, where they found Whitlow's body in Room 114. Whitlow had suffered significant cut wounds to his neck, throat, upper chest, and right arm and hand.

- There was substantial blood and blood spatter on the wall, bed, and floor of the hotel room. Based on his training and experience, detective Renkas believed anyone who was in the room with Whitlow when he was stabbed would likely have a significant amount of blood on his or her clothing or shoes.

- An eight-inch Winchester brand knife sheath was found next to Whitlow's body, but no knife was recovered.

- [The hotel manager], who was working at the front desk of the Road Star Inn on February 21, reported that Whitlow had been staying in Room 114 since February 17. [The manager] stated he knew Whitlow had been having problems with his wife.

- [A] . . . Road Star Inn [cleaning] employee[] reported that she was doing the laundry in Room 111 from approximately 1:00 to 1:30 p.m. on February 21, when she saw a person wearing a gray hooded sweatshirt knock on the door of Room 114. The person's hood was pulled over his or her head. The person was admitted into the room by someone inside, and [the cleaning employee] then heard a male voice screaming for help and heard what she thought was someone being hit. [The cleaning employee] went to the manager to get help and briefly saw the person in the hooded sweatshirt leaving. Hotel staff then entered the room, found Whitlow, and called police.

41

- [A hotel guest], who was staying in Room 115 at the Road Star Inn, reported he was in his room when he heard a female voice yelling. He thought it was the cleaning employee, so he left his room to see what was happening. He then realized the yelling voice could not be the cleaning employee because he saw her in the hallway. When [the guest] was just past Room 114, he heard a male voice yelling, "[H]elp me, help me." [The guest] then went to get help.

- Eleven-year-old R.L.D.J. was interviewed by police on the day of the stabbing and told them Whitlow was his father and Jackson was his mother. R.L.D.J. reported that his family had been living together at their home until a few days earlier, when Whitlow left to stay at the Road Star Inn. Police were aware from previous contacts with Whitlow and Jackson that they resided [on] . . . West Fourth Street in Appleton.

- R.L.D.J. reported Whitlow had left the family home because he and Jackson "had been having issues that included 'adult conversations' that became loud."

- R.L.D.J. told police he stayed home from school with Jackson on February 21, and in the early afternoon, Jackson became angry because Whitlow had destroyed some family pictures and keepsakes. Jackson then left the house and was gone for about fifteen to twenty minutes.

- When Jackson returned to the house, R.L.D.J. "heard a zipper sound and then heard [her] go directly into the bathroom" and take a shower. When Jackson got out of the shower, "she was in different clothing than . . . what she had been wearing earlier in the day."

- Jackson told R.L.D.J. not to tell anyone she had left the house that day.

Jackson, 363 Wis. 2d 554, ¶18 (eleventh, fifteenth, and sixteenth alterations in original).

¶79 Based on the untainted portions of the affidavit, we conclude that the search warrant application provided probable

42

cause to conduct a search of Jackson's residence. A search warrant affidavit provides probable cause for a search when, under the totality of the circumstances, it sets forth "a substantial basis for concluding that there was a fair probability that a search of the specified premises would uncover evidence of wrongdoing." State v. Romero, 2009 WI 32, ¶3, 317 Wis. 2d 12, 765 N.W.2d 756.

¶80 The affidavit in support of the search warrant for the home on Fourth Street in Appleton sought

> clothing, including but not limited to hooded sweatshirts, any knives or knife sheaths, any weapons, any firearms, . . . ; any materials, clothing, towels or other items containing blood or bloody substances . . . ; any materials or items that may contain trace blood evidence; . . . a 2007 gray in color, Chevrolet Malibu, registered to a Mastella L. Jackson.

¶81 Jackson was an obvious suspect in Whitlow's murder. Whitlow was staying in the hotel, not his home, because he was having problems with his wife. Their son, R.L.D.J., said that Jackson was very angry with her husband that day and left the house in the afternoon about the time the homicide occurred. When she returned she told R.L.D.J. not to tell anyone that she had left the house.

¶82 A witness at the hotel said he heard a female voice yelling near Room 114 where Whitlow's body was found, suggesting that a woman had killed Whitlow.

¶83 Inside the room, police found the body and a room covered with blood. The affiant disclosed that based on his

training and experience, he believed any person who would have been in the room with Whitlow at the time of his injuries would likely have significant areas of blood or blood splatter on his or her clothing or shoes. R.L.D.J. said his mother took a shower immediately after she got home and that she was in different clothing after the shower.

¶84 Officers found a knife sheath in the hotel room, supporting evidence of a stabbing. If Jackson was the culpable party, she might not have had time to dispose of the knife because she hurried home to shower and get out of her clothes.

¶85 Aside from the statements derived from Jackson's illegal interrogation, officers independently acquired all information presented in the affidavit accompanying the warrant application. Officers received information from the manager, guest, and cleaning employee at the hotel immediately after Whitlow's death and separate from the detectives' subsequent interactions with Jackson. Moreover, the circuit court found that "there was nothing that Ms. Jackson [said] that was then used to get [R.L.D.J.] to talk," so his statements were also separate from her interrogation. Although R.L.D.J. likely provided the information most probative of Jackson's actions after 8 p.m., officers possessed most information used in the affidavit before Jackson was even in custody for Miranda purposes at 7:25 p.m., and they had certainly begun conducting independent investigation before that time.

¶86 Collectively, this information speaks to a fair probability that officers would uncover bloody clothing and the

44

knife upon searching Jackson's residence. Taken together, information derived from various people at the hotel, from R.L.D.J.'s interview, and from the affiant officer's experience indicate that the affidavit excised of Jackson's statements established a strong, independent legal justification for the search of Jackson's residence.

¶87 Given that the officers began their search of Jackson's residence pursuant to a valid warrant based on probable cause, the State has presented considerable evidence to show that the searching officers inevitably would have discovered the knife and bloody clothing in the garage if officers had not brought Jackson back to her residence. The officers searching Jackson's residence began inside the house and methodically searched all bags and other containers that they encountered. Because the warrant allowed them to search both indoors and in the garage, the officers intended to carefully search the garage when they finished searching the house. By searching every bag and container in the garage, the officers eventually would have searched the garbage can containing the knife and clothing.

¶88 The search of Jackson's residence compares favorably to the search in Nix that the Supreme Court determined would inevitably have uncovered the victim's body. Searchers in Nix had specific instructions "to check all the roads, the ditches, [and] any culverts" in their assigned zones. Nix, 467 U.S. at 448. An investigator leading the search effort had obtained a map of the area where police eventually found the body, and the

45

investigator would have developed a search grid on the map calling for a search of the area ultimately identified by the defendant. Id. at 449. When the suspect revealed the body's location, officers found the remains in a culvert near a road in the expected search area. Id.

¶89 In this case, officers involved in the search had a systematic and orderly plan first to search Jackson's residence, then to search the garage. Their testimony proves that they had begun searching containers in a disciplined manner and that they would have continued that meticulous approach when searching the garage. Absent Jackson's arrival on the premises with the detectives, the officers would have identified the incriminating evidence within a matter of hours. Thus, the State has shown that the officers legally searching Jackson's residence had actively engaged in searching the premises before Jackson's arrival, and those officers would have continued the search and discovered the physical evidence without Jackson's involvement.

¶90 Jackson contends that this court's decision in Knapp should control the outcome in this case. In Knapp, this court held that physical evidence was inadmissible when "obtained as the direct result of an intentional Miranda violation." Knapp, 285 Wis. 2d 86, ¶82. But the circumstances surrounding the State's acquisition of the incriminating evidence distinguish the two cases. While serving an arrest warrant on the defendant in Knapp, the officer who obtained the evidence did so by asking a question without reading the defendant his Miranda rights. Id., ¶8. The State provided no other evidence demonstrating

46

that it would inevitably have obtained the physical evidence by legal means.    Here, in contrast, the State has presented testimony by multiple officers establishing an independent, legal basis by which officers would have obtained the knife and bloody clothing absent any involvement by Jackson.[10]

---

[10] At oral argument, the Deputy Solicitor General, making that office's first appearance before this court, emphasized the importance of the proof of inevitability in this case:

> If Jackson had dumped the knife and clothes in some random garbage can, or if she had thrown it into the river as she drove home, or she had buried it in her backyard . . . , in any of those circumstances, the State wouldn't be able to argue inevitable discovery in this case.    When the police officers initially asked her, "Where's the knife," they did it in an unconstitutional interrogation.    They had no idea what the answer was going to be.    If it was, for instance, in the [random] garbage can, or it's in the river, then the evidence would be excluded, and the police would have lost very valuable evidence that they might have discovered some other way.    If it comes in——the only time it comes in——is when they inevitably would have had it anyway, so they haven't gained anything. But they have a lot that they can potentially lose, so there's just no advantage to violating the Constitution . . . and hoping to get something out of the inevitable discovery doctrine because there's little to gain through it.

By dismissing the distinction between this case and State v. Knapp, 2005 WI 127, 285 Wis. 2d 86, 700 N.W.2d 899, as only a "supposed difference," the dissent undervalues the State's burden of proving inevitability.    Dissent, ¶131.    The dissent suggests that "[t]he State in Knapp might have been able to argue that some chain of events or alternative line of investigation demonstrated that law enforcement would have inevitably discovered the physical evidence."    Dissent, ¶126 n.30.    But Knapp contains none of the concrete indicia of inevitability present in this case.    Knapp involved a single law enforcement officer who illegally obtained physical evidence by asking a question that violated Miranda.    In contrast, this case

(continued)

47

¶91 Finally, we note that permitting admission of the knife and clothing does not leave Jackson without any recourse for the officers' illegal interrogation in this case. The detectives' decision to detain and question Jackson in the manner seen here is unacceptable by any constitutional standard. The circuit court properly excluded Jackson's statements to deter law enforcement officers from imitating the detectives' unjustifiable methods. At trial, Jackson will receive the benefit of that exclusion because the State will be barred from presenting the testimonial evidence obtained from her by illegal means. Although proof of inevitable discovery saves the knife and clothing from exclusion in this case, suppression of Jackson's incriminating statements provides an entirely appropriate remedy for the Miranda violations.

V.  CONCLUSION

¶92 At its core, the exclusionary rule discourages law enforcement officers from violating suspects' constitutional rights by removing a key incentive——incriminating evidence——that might otherwise encourage officers to engage in illegal conduct. The rule seeks to deter misconduct, rather than to punish it when it occurs. As a result, if the court were to insist upon suppression even when the State presents evidence proving that

---

involves a search warrant affidavit with untainted information demonstrating probable cause for a search, as well as officers independently conducting a methodical search of the premises. The exception turns upon evidence of inevitability, not merely a theory.

it inevitably would have discovered evidence, we would improperly apply exclusion in a purely punitive manner. Here, the State has demonstrated that, without any information illegally obtained from Jackson, officers had probable cause to search Jackson's residence, and they independently began a systematic and methodical search of the premises that would have revealed the physical evidence actually obtained by way of Jackson's suppressed statements. Because the State has met its burden of proof with regard to its independent search of the premises, we conclude officers inevitably would have obtained the knife and clothing in Jackson's garage. Therefore, we affirm the decision of the court of appeals and remand to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is affirmed.

APPENDIX

This Appendix reproduces the language of the Affidavit in Support of Search Warrant submitted for the search of Jackson's residence.  All personal identifying information and all information illegally obtained from Jackson has been redacted; all alterations are marked accordingly.


AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

WHEREAS, Detective Renkas of the Grand Chute Police Department has this day complained to the said court upon oath that on the 21st day of February, 2012, in said County in and upon certain premises in the Town of Grand Chute in Outagamie County, Wisconsin there is located a residence at [] W Fourth Street in the City of Appleton, Outagamie County, Wisconsin and more particularly described as follows:

> A split level duplex residence located on the south side of 4th Street, with the duplex unit of [] located on the west end of the duplex facing 4th Street, with black address numbers [] above the main front door, gray vinyl siding with white trim, dark grayish/black shingles with an attached two car garage

there are now located and concealed certain things, to-wit:

> clothing, including but not limited to hooded sweatshirts, any knives or knife sheaths, any weapons, any firearms, any paper documents tending to establish the identity of the parties residing at the location; any materials, clothing, towels or other items containing blood or bloody substances, cell phones; any materials or items that may contain trace blood evidence; any photographs at the home, any gravemarkers or funeral materials; shoes at the home; cell phone, car and/or house keys, cell phone records;

50

any caller ID items; a 2007 gray in color, Chevrolet Malibu, registered to a Mastella L. Jackson with WI license place [], VIN []

which things were used in the commission of, or may constitute the evidence of a crime, to-wit: Violation(s) of Homicide and Reckless Injury contrary to §940 of the Wisconsin Statutes.

NOW, THEREFORE, in the name of the State of Wisconsin, you are commanded forthwith to search said premises and persons on said premises for said things, and if the same or any portion thereof are found, to safely keep the property seized so long as necessary for the purpose of being produced as evidence on any trial or until further order of the court.

The facts tending to establish the ground for issuing a search warrant are as follows:

Affiant states that he has been a police officer for the past 5 years with the Grand Chute Police Department and in that capacity has knowledge of the following:

Your affiant reports that on February 21, 2012, officers were dispatched to the Roadstar Inn, located at 3623 W. College Avenue, in the Town of Grand Chute, Outagamie County, Wisconsin, at 1:25 pm for a medical call. Off. Jones reports dispatch advised the individual was face down, covered in blood. Off. Jones reports when he arrived at room 114 of the Roadstar Inn the ambulance and fire departments were already there. Off. Jones reports he was told by a paramedic the individual was deceased. Off. Jones reports when he entered the room there was a bloody phone receiver that was detached from the phone near the door and walkway. Off. Jones reports he walked into the

51

room and saw blood smeared against the far wall beyond the beds and there was a black male laying prone against the wall. Affiant reports that during the investigation, officers did locate a WI ID card in the hotel room identifying the male party as Derrick J. Whitlow, dob: [].

Affiant reports that he spoke with Jon Hagen, a deputy coroner who was called to the scene to make an initial assessment on Derrick Whitlow. Affiant reports that Hagen did share with him some photos taken at the scene that included photos of Derrick J. Whitlow and it was apparent that he had a very large area of injury to his right hand that appeared to be a very deep cut to the hand. Affiant also reports Jon Hagen reported that there is a significant area of injury to Whitlow's neck which includes a significant cut to his neck/throat area. Affiant also reports that in the upper left arm area Whitlow has a large laceration and large area of injury to his upper left chest area. Affiant reports that he spoke with Off Schellinger at the Roadstar who had been processing the scene and indicated that a knife sheath was located next to Whitlow which was approximately 8 inches in length with the writing 'Winchester' located on it. Affiant reports that within the hotel room were very significant areas of blood and blood splatter; that there was significant blood and blood splatter on the wall, bed and floor of the hotel room. Affiant reports that based upon his training and experience any other party who would have been in the room with Whitlow at the time of his injuries would likely

also have significant areas of blood and/or blood splatter on their clothing or shoes.

Affiant reports that Off. Jones reports that he spoke with [the hotel manager], an employee who was working the front desk of the Roadstar Inn on 2/21/12. [The manager] informed Off. Jones that the black male who was staying in Room 114 was Derrick Whitlow and that he had been saying at the Roadstar Inn since the 17th of February, 2012 with his son, who is approximately 10 years old. He said he knew that Derrick Whitlow has been having problems with his wife.

Affiant reports that he spoke with [a cleaning employee] who works at the Roadstar. [The cleaning employee] reports that she was working on 2/21/12; that she was doing the laundry in Rm 111 from approximately 1:00 to 1:30 pm when she heard and saw someone knock on Room 114, a party who was wearing a gray hooded sweatshirt with the hood pulled over their head. [The cleaning employee] reports that the person was ultimately let into Room 114 by someone in the room. [The cleaning employee] reports that she then heard a male party screaming for help and she heard what she thought was someone getting hit. [The cleaning employee] reports that she then went to the manager to get help and she did briefly see the person in the hooded sweatshirt leaving. [She] reports that hotel staff then entered Room 114, located an injured male party and called the police.

Affiant reports that he and Off. Jones reports that [a hotel guest] stated he is staying in Room 115 at the Roadstar. [The guest] stated that during the afternoon, he was in his room

53

when he heard a female voice yelling.  [The guest] stated that he thought the female was the cleaning employee so he went to see what was happening.  [The guest] stated that he went down the hallway and saw the cleaning employee so he then realized it was someone else.  [The guest] reports that he was just past Room 114 when he heard a loud yell and then heard a male party yelling "help me, help me."  [The guest] stated that he then went by the manager's office and then went outside and saw the fire department arrive.

Affiant reports that Det. Meyer of the Appleton Police Department did assist in the investigation and on 2/21/12 did Det. Meyer did speak with R.L.D.J. (DOB []), who stated his mother is Mastella Jackson and his father is Derrick Whitlow. He said his family had all been living together at their home, but his father left to stay at the Roadstar Inn a few days ago. Det. Meyer reports that based upon his previous contacts with Mastella Jackson and Derrick Whitlow in January of 2012, he knew they were residing at [] W Fourth Street in the City of Appleton, Outagamie County, Wisconsin.  RLDJ said when his dad went to stay at the hotel a few days earlier, his brother went with him to the hotel to help him because he had a broken leg. RLDJ reports that his dad had left because he and his mom had been having issues that included 'adult conversations' that became loud.  RLDJ reports that on 2/21/12 he did stay home from school and was with his mom.  RLDJ reports that during the late morning hours, he did ride with his mom to an appointment she had for an MRI; he stated when they arrived at the medical

54

location, his mom didn't leave the car and instead she stated she had sore feet and wasn't going in. RLDJ reports they then went back to their house. RLDJ reports that during the early afternoon, his mother became angry because his father had destroyed some pictures of her as a little child and other family pictures as well as his grandmother's grave marker. RLDJ stated that his mother left the residence and was gone for approximately 15-20 minutes. When his mother returned, he said he heard a zipper sound and then heard his mother go directly into the bathroom and she took a shower. He said when she got out of the shower, she was in different clothing than she what she had been wearing earlier in the day. After coming out of the shower, RLDJ said that his mom, Mastella told him not to tell anyone that she had left the house that day. Det. Meyer reports that when RLDJ was asked what his mom might have in the house for protection, he stated that mom did have a gun, a shorter gun you would hold in your hand and that he saw the gun this morning when mom had it in the house.

Affiant reports that on 2/21/12, Off. Schira of the Appleton Police Department did assist in making contact with Mastella Jackson at her residence at [] W Fourth Street in the City of Appleton, Outagamie County, Wisconsin. Affiant reports that both RLDJ and Jackson were located at the home. Off. Schira reports that located within the two car attached garage of the home is a 2007 Chevrolet Malibu, 4 door, gray in color, WI license place [], VIN[] registered to Mastella L. Jackson.

Off. Schira also reports at the residence on the curb area is located a garbage bin.

Affiant reports that on 2/21/12 officers did speak with Mastella Jackson about where she had been earlier on that day. Jackson did inform officers that she and Dwight Jackson [sic] did have two children together and they had previously resided together.  Jackson did state that a few days earlier Whitlow had left the residence and was staying at the Roadstar Inn. . . . Affiant reports that on 2/21/12 he did observe a vehicle in the garage at Mastella's residence.

Affiant further reports that the statements of [the hotel manager, the hotel guest, the hotel cleaning employee], Jon Hagen and RLDJ are presumed truthful and reliable as citizen witnesses. . . . Affiant, Off. Jones, Off. Schellinger, Det. Meyer and Det. Callaway are presumed truthful and reliable as they are sworn law enforcement officers.

Wherefore, your affiant prays that a search warrant be issued to enter said premises to search for the items identified herein along with the items listed on the face sheet of the search warrant.

Affiant – Det. Mike Renkas

¶93 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* Unlike the majority opinion, I would suppress the physical evidence obtained at Mastella Jackson's home following law enforcement officers' deliberate violations of Jackson's <u>Miranda</u> rights.

¶94 The majority decides this <u>Miranda</u> case in the same month as the fiftieth anniversary of <u>Miranda v. Arizona</u>, 384 U.S. 436 (June 13, 1966).[1] <u>Miranda</u> is perhaps the best-known criminal law decision of the United States Supreme Court.

¶95 The <u>Miranda</u> warnings are celebrated as a shield against compelled self-incrimination and violations of criminal suspects' constitutional rights. <u>Miranda</u> warnings stem from the very constitution our law enforcement officers are sworn to protect and defend.[2]

¶96 Moreover, <u>Miranda</u> warnings are "embedded in routine police practice" and "have become part of our national culture."[3]

---

[1] The American Bar Association used the fiftieth anniversary of the <u>Miranda</u> decision as this year's Law Day (May 1) theme.

Minnesota Judge Kevin S. Burke wrote in celebration of Law Day 2016 and the <u>Miranda</u> decision as follows: "Our criminal justice system has faults, but the <u>Miranda</u> decision 50 years later is the embodiment of what President Eisenhower hoped for in creating Law Day: a democracy that chooses not force, but the rule of law." Judge Kevin S. Burke, <u>Choosing the rule of law: a tribute to the Miranda decision</u>, MinnPost (Apr. 29, 2016), https://www.minnpost.com/community-voices/2016/04/choosing-rule-law-tribute-miranda-decision.

[2] *See* <u>Dickerson v. United States</u>, 530 U.S. 428, 438 (2000) ("<u>Miranda</u> is a constitutional decision . . . .").

[3] *See* <u>Dickerson</u>, 530 U.S. at 443.

1

¶97 Even fictional TV law enforcement officers like Dragnet's Detective Joe Friday and Law and Order's officers give Miranda warnings. If you missed the warnings in the original series you will hear them again and again in the reruns.[4]

¶98 The circuit court developed an extensive record about Jackson's interrogation, including testimony and audio recordings.[5]

¶99 Jackson was brought to the Grand Chute Police Department shortly after 4:30 PM. She was alone in a room for about two hours. Grand Chute Police officers began questioning Jackson at about 6:30 PM, and the circuit court found Jackson was in custody (i.e., not free to leave) at 7:25 PM. Nevertheless, the interrogation continued for more than five hours before officers advised Jackson of her Miranda rights.[6]

¶100 During the interrogation, Jackson was in pain and needed her prescription medication. Several times during the officers' questioning, she asked "to leave," "to go home," "not to say anything," and "to talk at a different time."[7] Despite the fact that Jackson was told at the outset, "[Y]ou're not

---

[4] See George C. Thomas III & Richard A. Leo, The Effects of Miranda v. Arizona: "Embedded" in Our National Culture?, 29 Crime & Just. 203, 246 (2002) ("[I]t is because of these shows and the mass media more generally——not the police, the legal system, or Supreme Court doctrine——that Miranda has become so much a part of our national culture.").

[5] Majority op., ¶35.

[6] Majority op., ¶2.

[7] Majority op., ¶¶22, 25; see also ¶27.

under arrest or, you know, you're free to go, you know,"[8] Jackson's requests to leave and not to speak went unheeded, all contrary to federal constitutional law.

¶101 The circuit court issued a comprehensive ruling suppressing the statements made during the interrogation.[9] The circuit court concluded that the failure to read Jackson her <u>Miranda</u> warnings was an intentional violation of Jackson's constitutional rights. The circuit court strongly condemned the officers and detectives for giving incredible testimony[10] and deliberately violating Jackson's rights.

¶102 The circuit court judge stated that when he considered the interrogation he "became sick to my stomach literally . . . . [T]his is textbook interrogation of what not to do if you want to be doing good police work and get stuff admitted in during a hearing."

¶103 The circuit court went on to denounce the officers' conduct as follows:

> I've never seen a case, been part of a case, or heard of a case that's worse than this in terms of what the police officers did in that interrogation room. . . . [T]his is just a clear violation of somebody's rights over a long period of time involving many different officers with lots of opportunities to have one of them step up and say, hey, this is not the way we need to do this.

---

[8] Majority op., ¶18.

[9] Majority op., ¶36.

[10] Majority op., ¶36.

3

¶104 Compounding the duplicity of the Miranda violation, when the officers finally read Jackson her rights, the detective assured Jackson that her rights would not be violated:

> Can I, can I read [Miranda warnings] to you first because I technically can't get into a lot of stuff without until I advise you of these and you decide whether or not you want to talk to me anymore, OK because I can't violate your rights, do you know what I mean? So can I read this to you and then you decide whether or not you want to talk to me because I can't really get into any in depth conversation with you until you either tell me yes or no that you're willing to talk to me. So let me read this to you and then you decide what you want to answer and we'll go from there and then anything I can answer for you I'll answer, presuming you want to talk to me. Sound fair?[11]

¶105 After hearing the Miranda warnings Jackson asked: "So earlier, when you, when you wouldn't let me leave . . . ." The detective cut her off.

¶106 Contrary to what the detective told Jackson, Miranda warnings are not a technicality——they are a constitutionally required "shield that protects against compelled self-incrimination."[12] We have recognized that Miranda's shield against compelled self-incrimination is "made of substance, not tinsel," and "[a]ny shield that can be so easily . . . cast aside by the very people we entrust to enforce the law fails to serve its own purpose, and is in effect no shield at all."[13]

---

[11] Majority op., ¶27 (emphasis added).

[12] State v. Knapp, 2005 WI 127, ¶72, 285 Wis. 2d 86, 700 N.W.2d 899.

[13] Knapp, 285 Wis. 2d 86, ¶72.

¶107 The court of appeals branded "the officers' actions during the interrogation of Jackson [as] reprehensible."[14] The majority opinion agrees that the circuit court's and court of appeals' condemnation of the police conduct was "warranted and appropriate."[15]

¶108 Our society asks law enforcement officers to perform an extraordinarily difficult and dangerous job. We rely on them to maintain public safety and defend the rule of law. And most law enforcement officers perform admirably, placing themselves in harm's way to protect the rest of us.

¶109 To enable them to do their important work, society entrusts law enforcement officers with enormous power. The power of law enforcement officers, however, like the power of all government officials, is not unchecked.

¶110 Our court has forcefully declared: "Just as we will not tolerate criminal suspects to lie to the police under the guise of avoiding compelled self-incrimination, we will not tolerate the police deliberately ignoring Miranda's rule as a means of obtaining inculpatory physical evidence."[16] Disregard for the rule of law, especially by those sworn to protect and defend it, breeds distrust, suspicion, and contempt in the

---

[14] State v. Jackson, 2015 WI App 49, ¶48, 363 Wis. 2d 554, 866 N.W.2d 768.

[15] See majority op., ¶69 ("[T]he circuit court and court of appeals, respectively, rebuked officers for 'flagrant' and 'reprehensible' violations of Jackson's rights——rebukes, we believe, that were warranted and appropriate.").

[16] Knapp, 285 Wis. 2d 86, ¶72.

community, and undermines the important and legitimate activities of law enforcement.[17]

¶111 In the instant case, by intentionally flouting Jackson's rights, law enforcement officers obtained incriminating statements from Jackson and took a shortcut to accelerate the discovery of incriminating physical evidence in Jackson's home——bloody shoes, clothes, and a knife Jackson allegedly used to kill her husband.[18] Although police searched Jackson's home for incriminating evidence pursuant to a warrant, the warrant was based in part on statements made during Jackson's unlawful interrogation, and the shoes, clothes, and knife were found only after officers brought Jackson (in custody) to her home at about 2:15 AM to point out the objects.

¶112 The incriminating statements Jackson made before and after she was given Miranda warnings remain suppressed. The suppression of Jackson's statements (including those statements made when she was in her home) is not challenged by the State.

---

[17] "When a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law. When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition." United States v. Olsen, 737 F.3d 625, 632 (9th Cir. 2013) (Kozinski, C.J., joined by four judges, dissenting from denial of rehearing en banc); see also Knapp, 285 Wis. 2d 86, ¶¶75, 79.

[18] See ¶134, infra (quoting Professor LaFave's criticism of a court's using the inevitable discovery doctrine under these circumstances).

Rather, the State challenges only the suppression of the physical evidence seized at Jackson's home.

¶113 The majority opinion agrees with the court of appeals' decision reversing the circuit court's suppression of the incriminating physical evidence.

¶114 A court is clearly saddened and disappointed to observe and write about intentional police misconduct violating a constitutional right. A court's expression of commitment to the Constitution rings hollow, however, if the court allows Miranda's shield against compelled self-incrimination to be cast aside without providing a remedy. True, Jackson's incriminating statements remain suppressed, but the majority does not offer either Jackson or the people of the State a remedy for the intentional, unwarranted, and unconstitutional shortcut police took in discovering the incriminating physical evidence. The remedy I propose, suppression of the physical evidence, has shortcomings, but suppression further deters intentional violations of Miranda, fulfilling "one purpose of the exclusionary rule[, which] is to deter such shortcuts . . . ." See 6 Wayne R. LaFave, Search & Seizure § 11.4(a), at 344-45 (5th ed. 2012). Not granting a remedy for this shortcut is not an acceptable option. See ¶¶136, 138-143, infra.

¶115 I conclude that to ensure that "those we entrust to enforce the law [do not] intentionally subvert a suspect's constitutional rights,"[19] suppression of the physical evidence

---

[19] Knapp, 285 Wis. 2d 86, ¶83.

obtained at Jackson's home is necessary. In concluding that suppression of the physical evidence is necessary, I adhere to the reasoning in State v. Knapp, 2005 WI 127, 285 Wis. 2d 86, 700 N.W.2d 899, which held that physical evidence obtained as a direct result of an intentional violation of Miranda is inadmissible under Article I, Section 8 of the Wisconsin Constitution.

¶116 In refusing to suppress the physical evidence obtained at Jackson's home, the majority opinion applies the inevitable discovery doctrine, an exception to the exclusionary rule.[20] I disagree with applying the inevitable discovery doctrine in the instant case. I would hold, based on Knapp, that Article I, Section 8 of the Wisconsin Constitution does not allow the State to rely on the inevitable discovery doctrine in cases of intentional police violations of Miranda.

¶117 I also have concerns about the majority opinion's approach to the substantive aspects of the inevitable discovery doctrine. I discuss these concerns in Part II of this dissent.

¶118 For the reasons set forth, I dissent and write separately.

I

¶119 The physical evidence should be suppressed under Article I, Section 8 of the Wisconsin Constitution, which provides (in relevant part):

---

[20] See majority op., ¶92.

8

(1) No person . . . may be compelled in any criminal
case to be a witness against himself or herself.

¶120 The text of the relevant portion of the Fifth Amendment to the United States Constitution is similar:

No person . . . shall be compelled in any criminal case to be a witness against himself . . . .

¶121 Although the text of Article I, Section 8 and the Fifth Amendment are similar, we need not interpret our Wisconsin Constitution in lock-step with the interpretation of the United States Constitution.[21]

¶122 In interpreting the Wisconsin Constitution, this court should take the position espoused by Wisconsin Supreme Court Justice Abram Smith in 1855:

In view of the obligations imposed upon me, or rather voluntarily assumed by me, . . . in my present position, I have felt bound to sustain that fundamental law——the constitution of the state, according to its true intent and meaning. That is the great charter of our rights, to which the humblest may at all times appeal, and to which the highest must at all times submit.

Let us then look to that constitution, adopted by the people of Wisconsin, and endeavor to ascertain its true intent and meaning . . . .

---

[21] See Knapp, 285 Wis. 2d 86, ¶¶59-62; see also Knapp, 285 Wis. 2d 86, ¶¶84-94 (Crooks, J., concurring); William J. Brennan, Jr., State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489, 500 (1977) ("[W]hile this results in a divergence of meaning between words which are the same in both federal and state constitutions, the system of federalism envisaged by the United States Constitution tolerates such divergence where the result is greater protection of individual rights under state law than under federal law . . . .") (quoted source omitted).

The people then made this constitution, and adopted it as their primary law. The people of other states made for themselves respectively, constitutions which are construed by their own appropriate functionaries. Let them construe theirs——let us construe, and stand by ours.

Att'y Gen. ex rel. Bashford v. Barstow, 4 Wis. 567 (*567), 785 (*757-58) (1855) (emphasis in original).

¶123 I turn to Knapp, which interpreted Article I, Section 8 of the Wisconsin Constitution. The Knapp court broke from the United States Supreme Court's interpretation of the Fifth Amendment, holding that when "physical evidence is obtained as the direct result of an intentional Miranda violation, we conclude that [Article I, Section 8 of] our constitution requires that the evidence must be suppressed."[22]

¶124 Let's begin with the facts in Knapp. The defendant, Knapp, was a parolee who was seen with a woman who was later murdered.[23] Based on a parole violation, an officer went to the defendant's house to apprehend him.[24] When the officer arrived, he told Knapp that he had to go to the police station, but never read him the Miranda warnings.[25] Before leaving Knapp's house, the officer questioned him about what clothes he was wearing when he was seen with the victim.[26] After Knapp pointed out the

---

[22] Knapp, 285 Wis. 2d 86, ¶2 (emphasis added).

[23] Knapp, 285 Wis. 2d 86, ¶5.

[24] Knapp, 285 Wis. 2d 86, ¶¶6-7.

[25] Knapp, 285 Wis. 2d 86, ¶7.

[26] Knapp, 285 Wis. 2d 86, ¶8.

10

clothes, the officer seized them and took Knapp to the police station.[27] Police later discovered the victim's blood on the sleeve of Knapp's sweatshirt.[28]

¶125 Knapp argued that the sweatshirt should be suppressed based on the officer's intentional violation of Miranda. The court agreed, relying on Article I, Section 8 of the Wisconsin Constitution and the deliberate violations of Miranda at issue. Although the court recognized that the exclusionary rule is not absolute, the court concluded that the need to deter intentional violations of individuals' constitutional rights and preserve the integrity of the judicial system required the application of the exclusionary rule when physical evidence is obtained as a direct result of an intentional Miranda violation.[29]

¶126 Knapp differs from the instant case in that no search warrant was issued in Knapp.[30] The officer in Knapp was not pursuing other means of searching the defendant's house at the time the intentional violation of Miranda occurred.[31] Thus, the Knapp court described the location of the physical evidence as a direct result of the Miranda violation. In contrasting the

---

[27] Knapp, 285 Wis. 2d 86, ¶8.

[28] Knapp, 285 Wis. 2d 86, ¶12.

[29] See Knapp, 285 Wis. 2d 86, ¶¶74-75, 79, 83.

[30] Jackson, 363 Wis. 2d 554, ¶45. Knapp does not involve the inevitable discovery doctrine. The State in Knapp might have been able to argue that some chain of events or alternative line of investigation demonstrated that law enforcement would have inevitably discovered the physical evidence.

[31] See Knapp, 285 Wis. 2d 86, ¶¶7-9.

11

instant case with Knapp, the court of appeals stated that "the knife, clothes, and shoes [in the instant case] would have been inevitably discovered by lawful means, notwithstanding the police misconduct."[32] The "lawful means" to which the court of appeals refers is the search of Jackson's home pursuant to the warrant.

¶127 Like the court of appeals, the majority opinion concludes that the physical evidence inevitably would have been discovered pursuant to the search warrant.[33] Perhaps. But the search warrant was based in part on Jackson's suppressed statements obtained in violation of Miranda.

¶128 To validate the search warrant, the court of appeals and majority opinion have to excise Jackson's suppressed statements.[34] Furthermore, although law enforcement had a search warrant, the physical evidence was found only after the officers took Jackson to her home and asked her to show them where she discarded the clothes, shoes, and knife. On these facts, the circuit court suppressed the physical evidence.

¶129 Whether locating the physical evidence in the instant case fits the verbal formula in Knapp of a "direct" result of a Miranda violation, locating the physical evidence is very much related to and can be described as a direct outgrowth of

---

[32] Jackson, 363 Wis. 2d 554, ¶45.

[33] See majority op., ¶75.

[34] See majority op., ¶¶75-76; Jackson, 363 Wis. 2d 554, ¶¶17-18.

Jackson's illegal interrogation before and after the Miranda warnings. By the time Jackson was taken to her home it was about 2:15 AM, and Jackson had been in custody and subject to questioning for more than seven hours. The circuit court suppressed Jackson's statements, including statements she made when the officers took her to her home and had her locate the physical evidence.

¶130 In suppressing Jackson's statements, the circuit court relied on Missouri v. Seibert, 542 U.S. 600 (2004),[35] and concluded that Jackson's statements were involuntary under the circumstances.[36] The direct causal connection between Jackson's illegally obtained (and properly suppressed) statements and the discovery of the physical evidence is clear and undeniable.

¶131 I do not view any supposed difference between Knapp and the instant case as sufficient to depart from the reasoning and holding of Knapp. Relying on the rhetorical distinction between evidence obtained as a "direct" (versus "indirect?")

---

[35] In Missouri v. Seibert, 542 U.S. 600 (2004), the United States Supreme Court addressed whether suppression of evidence is necessary for statements made after Miranda warnings are given if, before the officers gave the suspect Miranda warnings, an unconstitutional interrogation had taken place. The court held that such statements must be suppressed despite "the midstream recitation of warnings after interrogation and unwarned confession" in order to effectively comply with Miranda. Seibert, 542 U.S. at 604.

[36] The State did not challenge these aspects of the circuit court's decision. Indeed the State accepted for purposes of its brief that "Jackson's statements to the police were obtained in violation of Miranda and were involuntary, [and] that the police improperly relied on information obtained from Jackson to locate [the physical evidence]." Brief of Plaintiff-Appellant at 11.

13

result of a violation of <u>Miranda</u> distorts the facts of the instant case and the policy underlying <u>Miranda</u> and <u>Knapp</u>. The majority opinion's decision allowing the use of the inevitable discovery doctrine to avoid suppression of evidence that was concededly obtained as a direct outgrowth of a coercive, deliberate, illegal interrogation allows the inevitable discovery doctrine to swallow <u>Miranda</u>, the exclusionary rule, and <u>Knapp</u>.

¶132 Moreover, I disagree with the majority opinion's holding that good faith by law enforcement is not a prerequisite for relying on the inevitable discovery doctrine. I view good faith in the instant case as an essential element for the application of the inevitable discovery doctrine.

¶133 In disregarding the law enforcement officers' bad faith, the majority opinion relies on <u>Nix v. Williams</u>, 467 U.S. 431 (1984), the famous (or "infamous"[37]) Christian Burial Case. In <u>Nix</u>, the United States Supreme Court concluded that requiring "that the prosecution . . . prove the absence of bad faith would . . . withhold[] from juries relevant and undoubted truth that would have been available to police absent any unlawful police activity" and would "put the police in a worse position that they would have been in if no unlawful conduct had transpired."[38]

---

[37] See <u>Knapp</u>, 285 Wis. 2d 86, ¶30.

[38] <u>Nix v. Williams</u>, 467 U.S. 431, 445 (1984); <u>see also</u> majority op., ¶¶71-72.

14

¶134 <u>Nix</u> has spawned significant criticism. For example, Professor Wayne LaFave's treatise on criminal law (referenced by the majority opinion) states:

> Because one purpose of the exclusionary rule is to deter . . . shortcuts, there is much to be said for the proposition that the "inevitable discovery" rule should be applied only when it is clear that "the police officers have not acted in bad faith to accelerate the discovery" of the evidence in question.

6 Wayne R. LaFave, <u>Search & Seizure</u>, § 11.4(a) at 344-46 (5th ed. 2012) (quoting Brian S. Conneely & Edmond P. Murphy, Comment, <u>Inevitable Discovery: The Hypothetical Independent Source Exception to the Exclusionary Rule</u>, 5 Hofstra L. Rev.

137, 160 (1976)).[39]   Professor LaFave does not consider compelling the argument that "'if we hadn't done it wrong, we would have done it right . . . .'"  6 LaFave, Search & Seizure, § 11.4(a), at 347 (quoted source omitted).

¶135 The majority asserts that the uncertainty law enforcement officers face over the applicability of the inevitable discovery doctrine when they intentionally violate an individual's rights justifies application of the inevitable

---

[39] For criticism of and proposed limitations on the inevitable discovery doctrine, see also, e.g., Eugene L. Shapiro, Active Pursuit, Inevitable Discovery, and the Federal Circuits: The Search for Manageable Limitations Upon an Expansive Doctrine, 39 Gonz. L. Rev. 295 (2003-04) (noting the expansiveness of the inevitable discovery doctrine and describing a significant split among the federal circuits concerning whether the inevitable discovery doctrine requires a separate and independent investigation be ongoing at the time of the constitutional illegality); William C. Heffernan, Foreword: The Fourth Amendment Exclusionary Rule as a Constitutional Remedy, 88 Geo. L.J. 799, 856-57 (2000) (exploring alternatives to the exclusionary rule and arguing that the inevitable discovery doctrine should require (1) an independent investigation be underway when a tainted chain of events is unfolding; and (2) a demonstration by the State by clear and convincing evidence that the independent investigation would produce the same information discovered were it not for the illegality); George C. Thomas III & Barry S. Pollack, Balancing the Fourth Amendment Scales: The Bad-Faith "Exception" to Exclusionary Rule Limitations, 45 Hastings L.J. 21, 57 (1993) (noting the "inherently speculative nature" of the inevitable discovery doctrine and suggesting there is less reason to engage in that speculation where evidence was obtained through a bad faith violation of a defendant's rights); John E. Fennelly, Refinement of the Inevitable Discovery Exception: The Need for a Good Faith Requirement, 17 Wm. Mitchell L. Rev. 1085, 1100-06 (1991) (arguing that the courts should not favor intentional police lawbreaking by affording the misconduct the same treatment given honest mistakes).

discovery doctrine.[40] No empirical evidence supports this bare assertion. We are in an era recognizing the importance of evidence-based decision making, but all the majority musters is conjecture.

¶136 The majority also emphasizes the "societal costs" of applying the exclusionary rule in instances in which evidence inevitably would have been discovered by lawful means.[41] To be sure, there are such costs; however, other proposed remedies for law enforcement misconduct present other problems.[42] But not granting a remedy in the instant case is not an acceptable option. Nowhere in the majority's calculus is the cost to judicial integrity and deterrence of allowing the use of evidence obtained by flagrant and reprehensible police wrongdoing.

¶137 In Knapp, two key factors led this court to conclude that Article I, Section 8 required the suppression of evidence obtained as a direct result of a violation of Miranda. First, failing to suppress such evidence would "'minimize the seriousness of the police misconduct producing the evidentiary fruits, breed contempt for the law, and encourage the type of conduct that Miranda was designed to prevent, especially where

---

[40] Majority op., ¶71 (quoting Nix, 467 U.S. at 445) (alteration in original).

[41] Majority op., ¶¶46, 55.

[42] See generally Heffernan, supra note 39, at 818-19, 848-51, 854-58 (discussing the exclusionary rule's limitations and advantages as a remedy and exploring alternative remedies for constitutional violations).

17

the police conduct is intentional, as it was here.'"[43] Second, allowing the State to benefit from ill-gotten gains undermines the integrity of the judicial system.[44]

¶138 I agree with those who have written that "the need to deter is greater when the illegal activity of the police is deliberate. Society needs to make clear to the enforcers of our laws that when they deliberately violate constitutional principles a penalty must be paid."[45]

¶139 Thus, three states, Alaska, Massachusetts, and North Dakota, each relying on a state law or constitution, have narrowed the inevitable discovery doctrine to cases in which police do not knowingly or intentionally violate a suspect's rights. See, e.g., Commonwealth v. Mattier, 50 N.E.3d 157, 167 (Mass. 2016) (citing Commonwealth v. Sbordone, 678 N.E.2d 1184, 1190 (Mass. 1997)); State v. Holly, 833 N.W.2d 15, 33 (N.D. 2013) (citing State v. Phelps, 297 N.W.2d 769, 775 (N.D. 1980)); Smith v. State, 948 P.2d 473, 481 (Alaska 1997); see also United States v. Madrid, 152 F.3d 1034, 1041 (8th Cir. 1998) (declaring that courts are not required to apply the inevitable discovery doctrine "without regard to the severity of the police misconduct"); but see State v. Garner, 417 S.E.2d 502, 510-11 (N.C. 1992) (rejecting this view).

---

[43] Knapp, 285 Wis. 2d 86, ¶75 (quoted source omitted).

[44] Knapp, 285 Wis. 2d 86, ¶79.

[45] Steven P. Grossman, The Doctrine of Inevitable Discovery: A Plea for Reasonable Limitations, 92 Dick. L. Rev. 313, 356 (1988) (emphasis added).

¶140 As the Massachusetts Supreme Judicial Court put it:

> We think the severity of the constitutional violation is critical in deciding whether to admit evidence that it is shown would inevitably have been discovered. . . . Bad faith of the police, shown by such activities as conducting an unlawful search in order to accelerate discovery of the evidence, will be relevant in assessing the severity of any constitutional violation.

Commonwealth v. O'Connor, 546 N.E.2d 336, 340 (Mass. 1989) (internal citations omitted).

¶141 The concerns raised by these cases and commentators are echoed by our own decision in Knapp, and are as salient in the instant case as they were in Knapp. The circuit court, the court of appeals, the majority opinion, and I all agree that the violations of Jackson's rights in the instant case were intentional, deliberate, unjustifiable, and profoundly troubling. I am troubled that the majority opinion, despite its recognition of law enforcement's wrongdoing, minimizes the seriousness of the wrongdoing and in effect may encourage future violations by allowing law enforcement to fall back on the inevitable discovery doctrine even in unfortunate cases like this one.

¶142 Justice Louis Brandeis got it right in Olmstead v. United States, 277 U.S. 438, 468 (1928) (Brandeis, J., dissenting):

> Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the ends justifies the means——to declare that the government may commit crimes in order to secure the conviction of a private criminal——would

19

bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

¶143 Accordingly, I would adhere to our reasoning in Knapp, not the United States Supreme Court's reasoning in Nix, and hold that under Article I, Section 8 of the Wisconsin Constitution, the State may not rely on the inevitable discovery doctrine in cases in which law enforcement officers acted in bad faith by deliberately failing to give Miranda warnings.

## II

¶144 I have reservations about the majority opinion's discussion of the substantive aspects of the inevitable discovery doctrine. The majority opinion reformulates the three-prong analysis of the inevitable discovery doctrine applied by the court of appeals. Reformulating the analysis of the inevitable discovery doctrine was not an issue raised or discussed by the parties. Instead of the normal progression of issues being narrowed or limited on appeal, the majority opinion expands the issues.

¶145 True, as the majority opinion points out, some exceptions to the court of appeals' formulation of the inevitable discovery doctrine may be necessary, but the court of appeals' three-prong analysis (unlike the majority's free-flowing inevitability analysis) provides important guidance to circuit courts and the court of appeals.[46]

¶146 Additionally, given the focus of the inevitable discovery doctrine on whether evidence inevitably would have

---

[46] See majority op., ¶¶62-66.

20

been discovered by lawful means, I question the majority opinion's reliance on the "preponderance of the evidence" burden of proof.[47] "Proof by a preponderance of the evidence would require a mere showing that [an occurrence] is more likely than not . . . ."[48]

¶147 An inevitability is defined as something that is "sure to happen."[49] There is an obvious tension in requiring proof that an event is "more likely than not to happen" when the fact to be proved is that the event is "sure to happen."[50]

¶148 I would follow the practice of other courts and hold the State to the heightened "clear and convincing evidence" burden of proof in inevitable discovery cases. Increasing the burden of proof has both practical and symbolic significance,

---

[47] See majority op., ¶66.

[48] In re Commitment of West, 2011 WI 83, ¶80, 336 Wis. 2d 578, 800 N.W.2d 929.

[49] Merriam-Webster's Learner's Dictionary, Inevitable (2008).

[50] See United States v. Heath, 455 F.3d 52, 59 n.6 (2d Cir. 2006) (describing the "semantic puzzle" of "using the preponderance of the evidence standard to prove inevitability" and concluding that it was sufficient to "note the difference between proving by a preponderance that something would have happened and proving by a preponderance of the evidence that something would inevitably have happened.") (quoted source omitted; 6 Wayne R. LaFave, Search and Seizure, § 11.4(a) at 359-61 (5th ed. 2012) ("A 'majority of the courts that have utilized the exception have tended to define the necessary probability in terms of 'would,' which is the constitutional standard . . . .' 'It is not enough to show the evidence 'might' or 'could' have been otherwise obtained.'") (internal citations, footnotes, and quotation marks omitted).

21

impressing upon the factfinder the importance of the decision and reducing the chance that hypothetical findings of inevitability will swallow the exclusionary rule. See, e.g., State v. Rodrigues, 286 P.3d 809, 823 (Haw. 2012) (quoting State v. Lopez, 896 P.2d 889, 907 (Haw. 1995)); State v. Smith, 54 A.3d 772, 786-87 (N.J. 2012) (citing State v. Sugar, 495 A.2d 90, 104 (N.J. 1985)); Smith v. State, 948 P.2d 473, 479 (Alaska 1997); see also Nix, 467 U.S. at 459 (Brennan, J., dissenting) (asserting that proof of the inevitability of discovering evidence by lawful means should be shown by clear and convincing evidence).

¶149 For the reasons set forth, I dissent and write separately.

¶150 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.